WISSEL et al., Appellants,

v.

OHIO HIGH SCHOOL ATHLETIC ASSOCIATION et al., Appellees.

[Cite as *Wissel v. Ohio High School Athletic Assn.* (1992), 78 Ohio App.3d 529.]

Court of Appeals of Ohio,
Hamilton County.

Nos. C-900397 and C-900566.

Decided March 4, 1992.

**530**

*Lindhorst & Dreidame* and *Leo J. Breslin;* and *Joseph C. Kammer,* for appellants.

*Buechner, Haffer, O'Connell, Meyers & Healey* and *Roger W. Healey,* for appellee Ohio High School Athletic Association.

*Rendigs, Fry, Kiely & Dennis, John W. Hust* and *Ralph P. Mitchell,* for appellee National Federation of State High School Associations.

*Taft, Stettinius & Hollister, Gerald J. Rapien* and *M. Bradford Sanders,* for appellee National Operating Committee on Standards for Athletic Equipment.

---

DOAN, Presiding Judge.

The plaintiffs-appellants, John P. Wissel and his father, James E. Wissel, appeal from the order of the trial court granting summary judgment to the defendants-appellees, the Ohio High School Athletic Association ("OHSAA"), the National Federation of State High School Associations ("National Federation"), and the National Operating Committee on Standards for Athletic Equipment ("NOCSAE"). The Wissels assert on appeal that the trial court lacked jurisdiction to hear the motions for summary judgment, deprived them of due process by failing to impartially consider relevant evidence in ruling on the motions, and erred by granting summary judgment to the appellees. We reject the Wissels' procedural challenges but vacate the trial court's grant of summary judgment to all three appellees and remand for further proceedings consistent with this decision.

## I

In their first assignment of error, the Wissels assert that the trial court was "without jurisdiction to act in the case and otherwise deprived [them] of due process of law."

It appears from the record that on September 14, 1989, the same day the motions for summary judgment were to be heard, the parties were informed that the motions had been transferred for hearing to a visiting judge. According to the Wissels, on that date the visiting judge was "not elected or assigned to hold court or hear cases." The record contains, however, a letter from the Chief Justice of the Ohio Supreme Court assigning the visiting judge to the General Division of the Hamilton County Court of Common Pleas for the week of September 11–15, 1989. Concededly, the letter of assignment was not entered by the Hamilton County Clerk of Courts until September 15, 1989, or the day after the motions for summary judgment were heard. We know of no rule, however, nor have the Wissels cited to us any, which requires an otherwise valid letter of assignment from the Chief Justice to be entered by the local court in order to become effective.

Citing C.P.Sup.R. 2, the Wissels next argue that the visiting judge was "never authorized by the presiding judge of the Court in Hamilton County to hear cases in the general division of the court." The only language of conceivable relevance in C.P.Sup.R. 2 is that which provides that a presiding judge "shall chair all [meetings of all the judges of all the divisions of the court] and may assign judges on a temporary basis from one division of the court to serve another division as the business of the court may require." This language is clearly inapposite to the situation in the case *sub judice,* and clearly does not impose any requirement that the presiding judge reauthorize a valid assignment from the Chief Justice.

Furthermore, the Wissels, citing Loc.R. 7(C) of the Court of Common Pleas of Hamilton County, General Division, assert that "[t]he condition which permits assignment of a substitute judge was not fulfilled." Loc.R. 7(C) states in pertinent part:

"Whenever, upon the date set for trial of a cause, whether civil or criminal, counsel for the parties acknowledge their readiness to proceed to trial, and the judge to whom the cause has been assigned is engaged in another trial, or is absent, the Administrative Judge may forthwith assign such case to any judge of that division who is not engaged in the trial."

Initially we note that the language of Loc.R. 7(C) is inapposite since it expressly concerns a transfer on the verge of trial, not on a preliminary matter such as a motion for summary judgment. Further, Loc.R. 7(C)

expressly imposes only one "condition" on the reassignment, to wit, that it be made by the administrative judge. In the case *sub judice,* both parties agree that the originally assigned trial judge was the administrative judge.

■ Finally, the Wissels cite C.P.Sup.R. 4, which provides, in pertinent part:

"For the purpose of these rules, the individual assignment system is that system whereby, upon the filing in, or transfer to, a division of the court of a civil case * * * a case is immediately assigned by lot to a judge thereof, who thus becomes primarily responsible for the determination of every issue and proceeding in the case until its termination. Under such system, all preliminary matters, including requests for continuance, must be submitted for disposition to the judge to whom the case has been assigned, or if the assigned judge is unavailable, to the administrative judge."

C.P.Sup.R. 4 is essentially duplicated in Loc.R. 7(B) of the Court of Common Pleas of Hamilton County, General Division. As can be seen, the rule vests the originally assigned judge with "primary responsibility" for the determination of preliminary matters, but also expressly allows such matters to be submitted for disposition to the administrative judge if the assigned judge is unavailable. As observed by the court in *Berger v. Berger* (1981), 3 Ohio App.3d 125, 128, 3 OBR 141, 144, 443 N.E.2d 1375, 1379, the purpose of the rule is to "eliminate whimsical transfers," and to "inhibit real or perceived 'judge shopping' and judicial favoritism." The rule does not, however, absolutely prohibit transfers from the assigned judge, nor, with regard to the particular facts of this case, does the rule prohibit an assigned judge who is the administrative judge from transferring a matter to a visiting judge.

■ The Wissels argue that *Berger* "holds that a prerequisite to transfer of a case and reassignment of a trial judge is the execution of an entry stating the reason for the transfer of responsibility." The holding of *Berger,* which constitutes judicial rulemaking, is not mandatory upon this court. Moreover, the *Berger* court also made clear that any procedural irregularities that may attend a transfer of a case are waived unless asserted in a timely manner. "A party cannot await the decision with knowledge of the procedural irregularity before choosing to object to the defect if the decision is unfavorable." *Berger, supra,* 3 Ohio App.3d at 130, 3 OBR at 147, 443 N.E.2d at 1381. From the record in the instant case it appears that it was not until after the visiting judge had ruled favorably on the appellees' motion for summary judgment and their counsel had sent Wissels' counsel proposed entries that an objection was made to the transfer.

We hold, therefore, that the visiting judge who decided the motions for summary judgment herein was properly authorized to act by reason of the

valid letter of assignment from the Chief Justice, and that the circumstances of the transfer of the case to the visiting judge did not violate any of the Superintendence Rules for the Courts of Common Pleas promulgated by the Supreme Court, or any of the Local Rules of the Court of Common Pleas of Hamilton County, General Division.

The second issue raised by the Wissels under their first assignment is phrased as follows:

"The conduct of a trial court in accepting jurisdiction without valid appointment or assignment, in failing to conform to the law in the hearing and review of motions for summary judgment and otherwise in failing to preserve both the appearance and reality of fairness, is a denial of due process as guaranteed by the Constitution of the United States and the State of Ohio."

We have already concluded that the visiting judge was validly assigned and that there were no procedural irregularities attending the transfer of the case to render it voidable even had there been a timely objection. The balance of the Wissels' argument concerns in large part the visiting judge's alleged failure to consider the entire record before granting the motion for summary judgment after the September 14, 1989 hearing. Whatever the merits of this contention, the record establishes that the visiting judge, upon close of the February 1, 1990 hearing, agreed to reconsider his decision and read the entire record. There being no allegation this was not done, the Wissels' argument lacks its necessary predicate.

Finally, the Wissels argue that "[b]y the time [the visiting judge] expressed an intention to do what his duty required him to do, [their] constitutional franchise guaranteeing the 'appearance and reality of fairness' had evaporated." They contend that the visiting judge was not an "objective, uninterested party" because (1) his authority to hear the motion had been challenged, (2) his "flawed handling of the case in the first instance had been irrefutably proven," (3) he questioned the precedent which the Wissels cited to him, and (4) he demonstrated a predisposition to decide the case in the appellees' favor. Upon review of the record we find none of these arguments well taken and note, in passing, that the first three do not implicate due-process concerns.

The Wissels' first assignment of error is overruled.

## II

In their second assignment of error, the Wissels assert that the trial court erred in granting the appellees' motions for summary judgment.

John P. Wissel was playing defensive back for the LaSalle High School football team when he tackled an opposing player and was rendered a

quadriplegic. Afterward Wissel and his father brought suit against a number of defendants, including, among others, the manufacturers of the football helmet Wissel was wearing, the coach of the football team, the Archdiocese of Cincinnati, the Archbishop, and the appellees.

The Wissels brought suit against the appellees on the grounds of negligence and strict liability. They alleged that the appellees were negligent due to their failure to (1) properly educate each other and John Wissel on proper tackling techniques and equipment availability, (2) maintain and include a reasonable warning on the helmet that Wissel was wearing, (3) furnish Wissel with a heads-up chin strap or other protective apparatus to prevent the dropping of the wearer's head at the time of tackling, and (4) act on a rule change to require neck-protection equipment. They alleged that the appellees were strictly liable because the helmet furnished to Wissel was defective since it bore an inadequate, obliterated warning and did not have a "chin neck" support apparatus.

The appellees moved for summary judgment on essentially similar grounds. In response to the negligence claims against them, all three argued that they were voluntary, non-profit organizations whose rules, regulations and/or standards were not mandatory upon their members or the industry so that none of them owed a duty of reasonable care directly to Wissel. Further, the appellees argued that the record concretely established that no act or omission of any of them had proximately caused Wissel's quadriplegia, and that Wissel had not changed his position in reliance on any act or omission by the appellees. In response to the strict-liability claim against them, the appellees asserted that they could not be held liable upon such a theory because they did not design, manufacture, or sell the helmet Wissel was wearing when he sustained injury. Finally, OHSAA argued individually that it was protected from liability by the doctrine of sovereign immunity, since it had been delegated authority by the Cincinnati Board of Education and therefore its acts constituted "state action."

## III

OHSAA argued below and continues to insist on appeal that it is immune from tort liability under the doctrine of sovereign immunity. Sovereign immunity is by statute applicable to a "political subdivision," R.C. 2744.02(A)(1), which is defined as "a municipal corporation, township, county, school district, or other body corporate and politic responsible for governmental activities in a geographic area smaller than that of the state." R.C.

2744.01(F).[1] OHSAA asserts that it is entitled to invoke the doctrine because it is "a quasi governmental body of the State of Ohio."

In support of its argument, OHSAA cites numerous cases which hold that its activities constitute "state action." As counsel for the Wissels pointed out below, however, the "state action" to which these cases refer is the required nexus between state and challenged action for the purpose of bringing a constitutional claim. See, *e.g., Yellow Springs Exempted School Dist. Bd. of Edn. v. Ohio High School Athletic Assn.* (C.A.6, 1981), 647 F.2d 651. None of the cases cited actually holds that OHSAA is a "political subdivision" for the purpose of claiming sovereign immunity under R.C. 2744.01(F). In the absence of any persuasive legal authority for the position advanced by OHSAA, we find no basis to conclude that the doctrine of sovereign immunity is applicable to a "quasi governmental body," assuming *arguendo* that that term has any particular legal significance in this context.

## IV

■ The Wissels acknowledge that Restatement of the Law 2d, Torts (1965), Section 402A, which has been adopted as the law regarding strict products liability in Ohio, see *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 4 O.O.3d 466, 364 N.E.2d 267, applies by its own language "to one who *sells* any product in a defective condition." (Emphasis added.) The Wissels do not assert, moreover, that either of the appellees was the manufacturer, wholesaler, retail dealer or distributor of the helmet Wissel was wearing. They do, argue, however, that, because of the degree to which the appellees participated in the process by which the helmet was designed for safety and ultimately reached Wissel, the scope of Section 402A should be expanded to include them just as if they had placed the helmet in the stream of commerce.

The record establishes that OHSAA is composed of public, private and parochial high school members from Ohio. Each prospective member school obtains approval from its board of education before joining OHSAA. OHSAA describes itself as a "voluntary unincorporated non-profit association" with the power to "regulate, supervise, and administer interscholastic athletic competition among its member schools." OHSAA, in turn, is a member of the National Federation of State High School Associations, which is a voluntary, non-profit corporation composed of the various state high school associations.

---

1. But, see, *Enghauser Mfg. Co. v. Eriksson Eng., Ltd.* (1983), 6 Ohio St.3d 31, 6 OBR 53, 451 N.E.2d 228, in which the Ohio Supreme Court stated in its opinion (though not in the court's syllabus) that the sovereign immunity previously conferred upon "local governmental units" by the courts had been abrogated.

The National Federation has its own Football Rules Committee which publicizes the rules it adopts in a handbook. Apparently there is no formal written requirement that any of the state associations adopt and follow the rules promulgated by the National Federation; however, OHSAA concedes that it and "virtually all of the other 46 state high school athletic associations and the District of Columbia use the National Federation's Football Rule Handbook to govern the playing of interscholastic high school football in their respective states."

NOCSAE is a general non-profit corporation whose purpose, according to Article IV of its Articles of Incorporation, is as follows:

"A. To promote, conduct and foster research, study and analysis and the collection of data and statistics, relating to athletic equipment with a view to encouraging the establishment of standards in the manufacture and use thereof for the benefit of amateur athletics.

"B. To disseminate information and promote, conduct and foster other activities designated to increase knowledge and understanding of the safety, comfort, utility and legal aspects of athletic equipment.

"C. To provide a forum in which individuals and organizations may consult and cooperate in considering problems relating to athletic equipment.

"D. To do all of the foregoing exclusively for charitable, educational and scientific purposes."

In support of its motion for summary judgment, NOCSAE submitted as an exhibit a certified copy of its manual. The following excerpts from the portion of the manual entitled "QUESTIONS AND ANSWERS" are of particular relevance here:

"1. What is NOCSAE?

"NOCSAE (pronounced 'noxey') is the acronym for the National Operating Committee on Standards for Athletic Equipment. The group was formed in 1969 in response to the need for a safety standard for football helmets. In 1973, the NOCSAE Football Helmet Standard was developed, and the 1974 helmet models were first to undergo the NOCSAE tests. * * *

"2. Who belongs to NOCSAE?

"The members of NOCSAE are the National Collegiate Athletic Association, National Association of Intercollegiate Athletics, National Federation of State High School Associations, National Junior College Athletic Association, Sporting Goods Dealer Association, National Athletic Equipment Reconditioners Association, and Athletic Equipment Managers Association. In addition, the National Baseball League Players Association is an associate member.

"3. What are the NOCSAE Helmet Standards?

"They are voluntary test standards that have been developed to reduce head injuries by establishing minimum requirements of impact attenuation for football helmets and baseball/softball batting helmets.

" * * *

"5. Who Tests Football Helmets for Compliance With the NOCSAE Test Standards?

"Manufacturers test their own and competitors' helmets as they are produced. Qualified reconditioners partial test used helmets in the recertification process. The principal investigator tests new and used helmets in the event of controversy.

" * * *

"12. How can it be determined if a helmet has passed the NOCSAE Helmet Test Standard?

"Those helmets which have passed the NOCSAE Standard must bear the seal, 'Meets NOCSAE Standard,' which is permanently branded or stamped on the outside rear portion of the helmet. In addition, a list of those helmet models which have passed the standard is available upon request. Copies of the certification list can be obtained by contacting the President of NOCSAE.

" * * *

"15. Who enforces the NOCSAE Standards?

"NOCSAE does not possess a surveillance force to ensure compliance with the Standards. The Standards are voluntary and are available for adoption by any equipment manufacturer. However, if the firm affixes the NOCSAE seal to its helmets, it assumes responsibility that all of the helmets it manufactures will pass the NOCSAE Standards. If a helmet with a NOCSAE seal attached is found deficient, notice should be given to the NOCSAE Board of Directors.

" * * *

"16. What penalty will be imposed if an athlete is not wearing a helmet which has passed the NOCSAE Football or Baseball/Softball Batting Helmet Standard tests?

"It is mandatory for all student athletes playing football under either NCAA or National Federation rules to wear a NOCSAE certified helmet * * *.

"The penalty for failure to wear a NOCSAE certified helmet shall be determined by NCAA or National Federation of State High School Associations' Football Rules Committees.  * * * "

The Wissels argue that because all football helmets must meet the NOCSAE standard to be used in high school football games played under the

auspices of OHSAA and the National Federation, and manufacturers must therefore construct helmets to meet those requirements if they wish to market those helmets to member schools, NOCSAE, OHSAA and the National Federation are, in effect, part of the "producing and marketing enterprise responsible for placing [the helmets] in the stream of commerce." *Kasel v. Remington Arms Co.* (1972), 24 Cal.App.3d 711, 724, 101 Cal.Rptr. 314, 322. The Wissels seek to support this argument with cases, such as *Kasel,* in which courts in other states have held trademark licensors strictly liable, since the actual manufacturer produced the product in accordance with the licensors' formulas, specifications and/or directions. See *Kasel, supra; Torres v. Goodyear Tire & Rubber Co.* (1990), 163 Ariz. 88, 786 P.2d 939.

We are not persuaded by the Wissels' argument. NOCSAE, OHSAA, and the National Federation are not trademark licensors, manufacturers, retailers, or distributors. Collectively they help to determine a segment of the market by setting impact attenuation standards which must be met in order for that particular helmet to be used in certain athletic contests under their governance; that does not mean, however, that they become involved entrepreneurially in the design, manufacture, distribution or sale of the helmet. The cases holding trademark licensors strictly liable under Section 402A are clearly inapposite since such licensors have the "right to control the incidents of manufacture or distribution," *Torres, supra,* at 95–96, 786 P.2d at 946–947, and their participation is profit-motivated and entrepreneurial. The Wissels have cited no cases in which voluntary, non-profit organizations similar to NOCSAE, OHSAA, and the National Federation have been held to be "sellers" for the purposes of Section 402A, and we choose not to be the first to do so, as we are not convinced that strict liability was ever intended to apply to such organizations. The trial court's grant of summary judgment to the appellees on the Wissels's strict-liability causes of action is therefore affirmed.

## V

The Wissels assert, as the basis of their negligence actions against the appellees, Restatement of the Law 2d, Torts (1965), Section 323, which provides:

"[O]ne who undertakes gratuitously or for consideration, to render services to another * * * is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance on the undertaking."

Although Section 323 has not been expressly adopted by the Ohio Supreme Court, it has been cited with approval by the court in at least two cases: *Seley*

*v. Searle & Co.* (1981), 67 Ohio St.2d 192, 202, 21 O.O.3d 121, 127, 423 N.E.2d 831, 839, fn. 7; and *Briere v. Lathrop* (1970), 22 Ohio St.2d 166, 172, 51 O.O.2d 232, 235, 258 N.E.2d 597, 602.

As noted previously, all three appellees specifically disclaimed owing young Wissel any direct duty of reasonable care. We find it odd and disconcerting that organizations such as the appellees, which undertake to enhance the quality and safety of high school football games, disclaim that they do so to provide a service to the athletes who participate in the games. Moreover, we find similarly incongruous the argument that organizations whose rules govern the contest and whose discussions determine the type of athletic equipment that the athletes are provided do not owe those athletes a duty of reasonable care in their activities. The fact that these organizations purport to act gratuitously and for noble purposes does not, *ipso facto*, absolve them of a legal duty of care toward the athletes.

■ However, we do agree with the appellees that they were entitled to judgment as a matter of law under the two alternative elements of Section 323 that require, in order for liability to attach, that the defendant's alleged failure to exercise reasonable care either (a) increased the risk of harm, or (b) induced detrimental reliance.

Cases interpreting Section 323(a) have made clear that the increase in the risk of harm required is not simply that which occurs when a person fails to do something that he or she reasonably should have. Obviously, the risk of harm to the beneficiary of a service is always greater when the service is performed without due care. Rather, as the court stated in *Turre v. Government of the Virgin Islands, Virgin Islands Water & Power Auth.* (C.A.3, 1991), 938 F.2d 427, 432:

"[Section] 323(a) applies only when the defendant's actions increased the risk of harm to the plaintiff relative to the risk that would have existed had the defendant never provided the services initially. Put another way, the defendant's negligent performance must somehow put the plaintiff in a worse situation than if the defendant had never begun the performance. As we have noted when interpreting § 324A(a), a companion provision to § 323(a), to prevail under a theory of increased risk of harm a plaintiff must 'identify sins of commission rather than omission.' *Patentas v. United States,* 687 F.2d 707, 716 (3d Cir.1982) * * *."

In the case *sub judice,* the Wissels allege negligence on the basis of the appellees' individual and collective failure to take certain steps to improve the safety of high school football. Clearly, the sins charged are of omission, not commission. There is no evidence of record upon which one could reasonably conclude that the appellees, by their alleged failure to make the game safer, actually increased the risk of harm to Wissel above that which would have

existed had the appellees never provided the services that they did. Put differently, there is no basis to conclude that the appellees, by undertaking to make the game safer, actually made it less safe than it was originally.

It is clear, furthermore, that there is no basis in the record to reasonably conclude that young Wissel suffered harm because of his "reliance" on the appellees' undertaking as that word has been construed under Section 323(b). Courts have generally required that the plaintiff seeking to impose liability under Section 323(b) show actual or affirmative reliance, *i.e.*, reliance "based on specific actions or representations which cause the persons to forego other alternatives of protecting themselves." *Cracraft v. City of St. Louis Park* (Minn.1979), 279 N.W.2d 801, 807; see, also, *Turre, supra,* 938 F.2d at 431. In the case *sub judice,* there is no basis to conclude that young Wissel affirmatively relied on the actions or representations of the appellees to the extent that he chose not to wear another, safer helmet (assuming *arguendo* that such a helmet was available),[2] or that he played or tackled differently than he would normally have done in reliance upon the appellees' actions or representations.

We conclude, therefore, that the record does not, as a matter of law, support any reasonable theory of an increased risk of harm under Section 323(a), or detrimental reliance under Section 323(b). Indeed, were we convinced that Section 323 constituted the only basis to impose liability for negligence in the matter herein, we would sustain the trial court's grants of summary judgment. However, the parties, by addressing Section 323, necessarily bring into consideration Section 324A, the companion provision to Section 323.

Section 323 contemplates the traditional situation in which the Good Samaritan undertakes to provide a service directly to the plaintiff in the absence of a pre-existing legal duty. In the case *sub judice,* however, the situation is more complex. While it is true that there existed no pre-existing legal duty between young Wissel and the appellees, Wissel was owed a general duty of reasonable care by LaSalle High School in the conduct of its football program. The school, in turn, allowed the conduct of its football games to be largely governed by the policies and decisions of the appellees. The appellees were cognizant of the role they served and the degree to which their decisions were adopted (either voluntarily, by fiat, or by imposition) by the school. In such case, Restatement Section 324A, the companion section to Section 323, would appear the more appropriate framework for imposing liability.

---

**2.** Much of the Wissels' negligence claim against the appellees centered upon the testimony of "Red Dog" Ettinger, a former professional football player, and his efforts to have the appellees adopt his invention, the "Heads–Up" Chin Strap, as required equipment on football helmets worn by high school athletes.

Section 324A provides:

"One who undertakes, gratuitously or for consideration, to render services to another *which he should recognize as necessary for the protection of a third person* or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

"(a) his failure to exercise reasonable care increases the risk of such harm, or

"(b) *he has undertaken to perform a duty owed by the other to the third person,* or

"(c) the harm is suffered because of reliance of the other or the third person upon the undertaking." (Emphasis added.)

As can be seen, Section 324A differs from Section 323 in that it provides an additional ground for imposing liability in subsection (b), *i.e.,* that the defendant undertook to perform a duty owed by the other to the third person. As the subsections are phrased alternatively, it is clear that proof of one is sufficient to impose liability.

"[T]he law is well recognized that if under the pleadings and facts a party is entitled to relief under existing law, such relief will not be denied because counsel are in error in asserting the proper applicable law." *E.H. Bardes Range & Foundry Co. v. Weaver* (1942), 36 Ohio Law Abs. 383, 44 N.E.2d 130. As it appears that Section 324A may state the "proper applicable law" in the case *sub judice,*[3] and because the trial court was not presented with and therefore did not consider or decide the motions for summary judgment on this basis, and the parties have not briefed or otherwise stated their positions on the applicability of this section, we vacate the grants of summary judgment with respect to all three appellees in order for the trial court to consider the motions in light of the law set forth herein.

*Judgment accordingly.*

KLUSMEIER and HILDEBRANDT, JJ., concur.

---

**3.** Although we have found no cases in which the Ohio Supreme Court has expressly adopted Section 324A, the court in *Hill v. Sonitrol of Southwestern Ohio, Inc.* (1988), 36 Ohio St.3d 36, 521 N.E.2d 780, cited Section 324A. Other Ohio appellate courts have either cited or employed Section 324A in such manner as to assume, *sub silentio,* its place in Ohio law. See *Schaefer v. D & J Produce, Inc.* (1978), 62 Ohio App.2d 53, 16 O.O.3d 108, 403 N.E.2d 1015; *Barrow v. Lally* (Jan. 15, 1987), Cuyahoga App. Nos. 51503 and 51524, unreported, 1987 WL 5459. Section 324A has, in fact, been referred to as a companion or analogous provision to Section 323. See *Turre,* cited in text. We consider, therefore, that, if confronted with the issue directly in a case that warranted its application, the Ohio Supreme Court would adopt Section 324A.