RINE, Appellant,

v.

SABO; Pi Kappa Alpha Fraternity, Appellee.

[Cite as *Rine v. Sabo* (1996), 113 Ohio App.3d 109.]

Court of Appeals of Ohio,
Sixth District, Lucas County.

No. L–95–271.

Decided July 26, 1996.

*Thomas M. Moroney, Reese M. Wineman* and *Jennifer A. Kriausky,* for appellant.

*Thomas J. Antonini,* for appellee.

ABOOD, Judge.

This is an appeal from a summary judgment granted by the Lucas County Court of Common Pleas which dismissed appellant Heather L. Rine's complaint against appellee Pi Kappa Alpha fraternity ("PiKA") for damages for negligence and intentional and/or negligent infliction of emotional distress.

On appeal, appellant Heather L. Rine sets forth the following assignment of error:

"The trial court erred in granting [appellee] PiKA's motion for summary judgment as there exists [*sic*] several issues of material fact which should be presented to a trier of fact."

The facts which are relevant to the issues raised on appeal are as follows. On or about November 23, 1992, appellant reported to Toledo police that on November 18, 1992, she had been assaulted and raped by Alan ·M. Sabo. On November 24, 1992, Sabo was arrested and charged with rape. At the time, appellant was working at United Parcel Service ("UPS") and pursuing a college degree at the University of Toledo ("UT"), although she was not registered as a student for the 1992 fall semester. Sabo, who was also a UT student, was a member of PiKA and resided at the fraternity's house, also known as Bowman House, near the UT campus. At all times relevant to this lawsuit PiKA was an unincorporated chapter of Pi Kappa Alpha fraternity.

On November 18, 1993, appellant filed the civil complaint herein against Sabo, which alleged that Sabo raped her at the "Bowman House Fraternity at 2955 Dorr Street in Toledo, Ohio," and that as a result of that "malicious and vicious sexual assault" she incurred permanent "physical injuries" as well as "mental and emotional injuries," forcing her to quit her job at UPS and to withdraw permanently from UT. On February 14, 1994, Sabo filed an answer. On September 22, 1994, appellant filed a "motion to amend complaint and to add a new party defendant" and a memorandum in support thereof in which she asserted that "[t]hrough depositions and other discovery, [she] has become aware * * * that Defendant Pike [1] Fraternity committed tortious behavior resulting in injuries to her." (Footnote added.)

Appellant's motion was granted and, on October 26, 1994, the first amended complaint was filed, which added PiKA as a defendant and alleged that appellant

---

1. PiKA is referred to throughout the parties' briefs and the trial court's opinion by various names and symbols, which include "Pike," "PKE," "ΠKE" and PiKA, the designation which shall be used throughout this opinion.

suffered "physical and emotional injuries" and "monetary damages" because of (a) a breach of PiKA's assumed duty to provide security for "guests and members" at Bowman House, and (b) PiKA's decision to "wage a campaign" against her by ostracizing her "as revenge for her decision" to file rape charges against Sabo. On January 20, 1995, PiKA filed an answer to the amended complaint.

On February 23, 1995, appellant filed a second motion to amend the complaint, "to [e]nsure that each remedy available to her is clearly plead [sic]." Appellant's motion was granted and, on April 3, 1995, the second amended complaint was filed, which sought, as to both Sabo and PiKA, damages for physical, emotional and mental injuries, including loss of income, loss of educational opportunity and necessity of psychological treatment. As to Sabo, counts one through four of the complaint specifically set forth claims of negligence, assault, battery and intentional and/or infliction of emotional distress. As to PiKA, counts five and six specifically set forth claims of negligent breach of duty for failure to "provide adequate security," and negligent and/or intentional infliction of emotional distress for waging a campaign to ostracize appellant "for her decision to legally pursue Sabo's attack."

On April 5, 1995, PiKA filed a "motion for summary judgment and memorandum in support" in which it asserted that (1) the security program referred to in the complaint is a "designated driver's program" which did not give rise to a duty to protect appellant from harm while she was inside the fraternity house on November 18, 1992; (2) the discussion by PiKA members at a meeting on November 24, 1992 did not constitute a "campaign to ostracize" her, and conduct by PiKA members subsequent to that meeting did not amount to "extreme and outrageous conduct" sufficient to support a claim of intentional infliction of emotional distress by the fraternity; and (3) it is not liable for negligent infliction of emotional distress because there is no evidence that appellant "was ever cognizant of real as opposed to non-existent danger." In support thereof, PiKA relied upon the affidavit of PiKA chapter president Kurt Klier, a copy of its written "Policy 127 Designated Drivers Program" and the March 29, 1995 deposition testimony of appellant.

In his affidavit, Klier stated that a meeting was held for PiKA members "[s]hortly after Sabo's arrest"; that PiKA did not decide to either bar appellant from fraternity activities "or otherwise ostracize her"; that PiKA's designated driver's program, which was in operation on November 18, 1992, provided rides for PiKA members from local bars on weekends and "[was] not designed for or used for security at the fraternity"; and that although uniformed security officers are provided by PiKA for fraternity parties, there were no such events taking

place at Bowman House on November 18, 1992, and no security officers were present.

In her deposition, appellant testified that she became acquainted with Sabo through her employment at UPS, that she had high school friends who were Sabo's fraternity brothers at PiKA, and that her roommate Barb Hart's boyfriend, Jason Kubera, was a member of PiKA. She further stated that (1) on November 24, 1992, the day Sabo was arrested, Hart awakened her and stated that she had learned from Kubera that the PiKA members held a meeting at which they had been advised not to speak to appellant or anyone associated with her, or talk about the "incident"; (2) from that time on no PiKA members would speak to her; and (3) she was so upset by what had happened to her that she had to quit her job at UPS.

As to specific occasions when she was harassed by PiKA members, appellant testified that (1) in February 1993, while at a high school basketball game with her parents and her friend, Lisa Smith, she was told that a group of people who were "associated with people associated with [PiKA]" called her a "slut," causing her to leave the game because she felt "very uncomfortable"; (2) at least three other times when she saw PiKA members on the UT campus she felt "uncomfortable"; and (3) on at least five separate occasions while she was working a summer job at Cedar Point in 1993, groups of PiKA members pointed and laughed at her, causing her to become very upset and, as a result, she quit her job before the end of the summer.

As to the emotional and physical effects she experienced after November 24, 1992, appellant testified that she feels "uncomfortable" upon seeing persons who are wearing PiKA's letters or colors; she moved to Michigan in July 1993, after leaving her job at Cedar Point, to avoid having any contact with PiKA members; she underwent five months of counselling from Dr. Martha Murphy, a psychologist who diagnosed her as having post-traumatic stress disorder; and she still suffers symptoms related to her emotional distress, which include a general feeling of fear, a lack of trust, "uncontrollable emotions," shaking and nausea, and trouble in sleeping.

On May 17, 1995, appellant filed a "brief in opposition" to summary judgment, in which she argued that PiKA is not entitled to summary judgment because there is a genuine issue of material fact as to (a) whether the November 24, 1992 meeting was held to order PiKA members to harass, ostracize and take revenge upon her; (b) whether PiKA's members were acting on behalf of the fraternity when they harassed her after the meeting; (c) whether the members' conduct amounted to "extreme and outrageous" and "utterly intolerable" behavior; and (d) whether the members' actions proximately caused her emotional, financial and physical distress. In support thereof, appellant relied upon her own affidavit, the

affidavit, clinical notes and report of psychologist Martha H. Murphy, a copy of PiKA's answers to her interrogatories, and excerpts from the deposition testimony of Sabo and Klier.

In her affidavit, appellant stated that PiKA members were pointing, "jeering, and loudly calling [her] names such as 'slut' and 'bitch'" at a basketball game; that three months later, while visiting a bar in Toledo with Smith, she became "afraid and intimidated" and immediately left the bar when she saw "men wearing PKE Fraternity letters and/or symbols on their clothing"; that she quit her job at Cedar Point in July 1993 "to avoid the confrontations" with PiKA members; and that her physical symptoms, which "were aggravated by the actions of the members of the PKE Fraternity," include fear, anxiety, vomiting and sleeplessness, and that:

"20. I have been and am afraid of the PKE Fraternity, and have lost sleep, been physically ill, and have otherwise suffered emotionally and physically because of the behavior of the PKE fraternity members. * * *"

Dr. Murphy stated in her affidavit and attached written report that she treated appellant from January 1993 until May 1993; that appellant discussed anxieties and fears related to PiKA members at her counselling sessions; that when appellant took the job at Cedar Point, her symptoms of post-traumatic stress disorder had decreased; and that, in her opinion, "the reported abuse, harassment and otherwise cruel behavior of the fraternity brothers who targeted [appellant] after she reported being raped would contribute to and proximately cause [appellant] to suffer aggravated symptoms of the post traumatic stress disorder."

Appellant referred to those portions of Sabo's deposition testimony in which he stated that he was told by several fraternity brothers that the PiKA meeting on November 24, 1992 was held "to inform everybody of the situation. It's just protocol with fraternities, and [appellant] was then banned from all Pike functions, properties, things like that. And nobody was permitted to either speak with her or discuss anything with her friends or anything like that."

Appellant cited to that portion of Klier's deposition testimony in which he stated that he attended the November 24, 1992 meeting and that fraternity brothers Jason Kubera, Brian Reidel and Scott Lynch also attended the meeting.

On May 26, 1995, PiKA filed a reply, in which it argued that (a) "the hearsay evidence offered [by appellant], even if considered, wholly fails to demonstrate a decision to seek revenge by tormenting [her]"; and (b) "nowhere does [appellant] demonstrate why this Court should * * * hold PiKA liable for conduct which its members allegedly committed outside the scope of their membership."

On June 19, 1995, appellant filed a "surreply" in which she repeated the facts as previously set forth and asserted that "[t]he facts and law presented thus far are sufficient and enough in dispute to warrant a trial of this case before a jury."

On July 24, 1995, the trial court filed a judgment entry in which it found that the following evidence was inadmissible hearsay: (1) appellant's deposition testimony as to the subject matter of PiKA's November 24, 1992 meeting, as relayed to her by Barb Hart; (2) Sabo's deposition testimony as to what he was told by other PiKA members regarding the subject matter of the November 24, 1992 meeting; and (3) those portions of appellant's testimony in which she states that PiKA members called her a "slut" and a "bitch" at the basketball game.

The trial court further found, based on the admissible evidence, that (1) PiKA did not negligently breach a duty of care to appellant, since its "security program" was actually a program to provide members with transportation home from local taverns; (2) appellant had not established that she either relied on PiKA's security program or was placed in a dangerous position because of PiKA's failure to provide security; and (3) PiKA cannot be found liable for the negligent or intentional infliction of emotional distress because (a) appellant had presented no admissible evidence that PiKA "engaged in any conduct directed toward [her]" through persons who were acting within the scope of their authority as fraternity members; and (b) even if all of appellant's evidence was admissible, the PiKA members' actions did not rise to level of "extreme and outrageous" conduct. Accordingly, the trial court granted the motion for summary judgment and dismissed appellant's complaint as to PiKA.[2] On September 1, 1995, appellant filed a timely notice of appeal.

In her assignment of error, appellant asserts that (1) PiKA breached a "duty of ordinary reasonably [sic] care" when its members "harassed, taunted, jeered, and otherwise drove [her] away from wherever they could"; and (2) she is entitled to summary judgment as a matter of law because PiKA never addressed "the merits" of her claim for intentional and/or negligent infliction of emotional distress. In support thereof, appellant argues that (1) the evidence she presented in opposition to summary judgment, regardless of its admissibility, is sufficient to "raise an issue of fact"; (2) "[o]nly when there is absolutely no issue of fact, should summary judgment be granted"; (3) PiKA produced no evidence in opposition to her claim that it intentionally caused her to suffer serious emotional distress by deliberately advising its members to harass and humiliate her, causing her to give up her job, move to another state and undergo lengthy psychological treatment; and (4) the evidence she presented as to the behavior of

---

2. On August 4, 1995, appellant voluntarily dismissed the complaint as to Sabo, who is not a party to this appeal.

PiKA members after the November 24, 1992 meeting creates an inference that is sufficient to raise a genuine issue of material fact as to whether PiKA directed its members to ostracize and harass her.

PiKA responds that (1) appellant has presented no admissible evidence "that PiKA held a meeting and agreed to ostracize and torment [her]"; (2) "even assuming that PiKA deliberately organized a campaign to torment [appellant], the subsequent conduct which [she] complained of did not rise to the level of extreme and outrageous conduct"; (3) appellant's evidence does not support a claim for negligent infliction of emotional distress because she has not demonstrated that she "was ever cognizant of real as opposed to non-existent danger"; and (4) even if PiKA had voluntarily assumed such a duty, there was no evidence presented that by exercising reasonable care it could have protected appellant from harm.

In reviewing a summary judgment, this court must apply the same standard as the trial court. *Lorain Natl. Bank v. Saratoga Apts.* (1989), 61 Ohio App.3d 127, 129, 572 N.E.2d 198, 199–200. Summary judgment will be granted when there remains no genuine issue of material fact and, when construing the evidence most strongly in favor of the nonmoving party, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law. Civ.R. 56(C). Initially, the party seeking summary judgment bears the burden of delineating which areas of the opponent's claim raise no genuine issues of material fact. The moving party may support its assertions "by affidavits or otherwise as allowed by Civ.R. 56(C)." *Mitseff v. Wheeler* (1988), 38 Ohio St.3d 112, 115, 526 N.E.2d 798, 801. Once the moving party meets its burden, the nonmoving party must produce evidence on the issue or issues identified by the movant for which it bears the burden of production at trial. *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 570 N.E.2d 1095, paragraph three of the syllabus.

As to the admissibility of the evidence presented by appellant in opposition to summary judgment, pursuant to Civ.R. 56(E), evidence presented in a summary judgment case in the form of "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence [at trial], and shall show affirmatively that the affiant is competent to testify to the matters stated therein." *Id.; Dill v. Ray* (Mar. 19, 1993), Wood App. No. 92–WD–060, unreported, 1993 WL 77065.

At trial, "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter." Evid.R. 602. Evidence presented in the form of "a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted" is inadmissible as hearsay, unless an exception applies. See Evid.R. 801(C) and 802.

■ This court has reviewed the entire record of proceedings before the trial court and, upon consideration thereof and the law, finds that (1) appellant's testimony as to the statements made by Barb Hart and Sabo's testimony as to the purpose of the November 24, 1992 meeting are hearsay; (2) appellant has not argued on appeal that any exception to the hearsay exclusion applies to any of those statements; and (3) the trial court did not act in abuse of its discretion when it refused to consider such hearsay as evidence in the summary judgment proceedings.

■ As to appellant's claim of negligence based on PiKA's alleged failure to provide proper security on the night in question, before a defendant can be found liable for such a breach of duty, the plaintiff must demonstrate "that the defendant's alleged failure to exercise reasonable care either (a) increased the risk of harm, or (b) induced detrimental reliance" on the part of the injured party. *Wissel v. Ohio High School Athletic Assn.* (1992), 78 Ohio App.3d 529, 540, 605 N.E.2d 458, 465.

■ It is undisputed in this case that (a) PiKA's "security program" consisted only of a program to drive members home from area taverns; (b) appellant perceived no danger when she followed Sabo up to his room before the alleged rape occurred; and (c) appellant presented no evidence that she relied upon PiKA to provide security on November 18, 1992.

Upon consideration of the foregoing, this court finds that appellant has failed to present admissible evidence that is sufficient to raise a genuine issue of material fact as to whether PiKA breached a duty of care to her by failing to provide sufficient security at the fraternity house and, when construing the evidence before the trial court most strongly in favor of appellant, reasonable minds can only conclude that appellee is entitled to judgment as a matter of law on appellant's negligence claim.

■ As to appellant's claim for intentional infliction of emotional distress, the four essential elements of such a claim are as follows:

"1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff; 2) that the actor's conduct was so extreme and outrageous as to go 'beyond all possible bounds of decency' and was such that it can be considered as 'utterly intolerable in a civilized community,' * * * 3) that the actor's actions were the proximate cause of plaintiff's psychic injury; and 4) that the mental anguish suffered by plaintiff is serious and of a nature that 'no reasonable man could be expected to endure it' * * *." *Pyle v. Pyle* (1983), 11 Ohio App.3d 31, 34, 11 OBR 63, 66, 463 N.E.2d 98, 103.

"Extreme and outrageous" conduct has been described as occurring in cases "in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen & Helpers of Am.* (1983), 6 Ohio St.3d 369, 375, 6 OBR 421, 426, 453 N.E.2d 666, 671. "Serious emotional distress" is defined as "emotional injury which is both severe and debilitating." *Paugh v. Hanks* (1983), 6 Ohio St.3d 72, 6 OBR 114, 451 N.E.2d 759, paragraph three of the syllabus. In this case, it is not disputed by PiKA that appellant suffered emotional distress as a result of the actions of PiKA members.

Upon consideration of the foregoing, this court finds that (1) appellant has not presented admissible evidence to show that PiKA ordered its members to engage in the complained-of conduct or that the actions of the PiKA members were anything more than random occurrences; (2) appellant has not submitted evidence that is sufficient to raise a genuine issue of material fact as to the existence of "extreme and outrageous conduct" on the part of PiKA; and (3) when construing the admissible evidence that was before the court most strongly in favor of appellant, reasonable minds could only conclude that appellee PiKA is entitled to judgment as a matter of law on appellant's intentional infliction of emotional distress claim.

As to appellant's claim for negligent infliction of emotional distress, in Ohio, "recovery for negligent infliction of emotional distress [is limited] to such instances as where one was a bystander to an accident or was in fear of physical consequences to his own person." *High v. Howard* (1992), 64 Ohio St.3d 82, 85–86, 592 N.E.2d 818, 820–821, citing *Paugh v. Hanks, supra,* reversed on other grounds in *Gallimore v. Children's Hosp. Med. Ctr.* (1993), 67 Ohio St.3d 244, 617 N.E.2d 1052. A claim for negligent infliction of emotional distress is recognized "only where there is cognizance of a real danger, not mere fear of non-existent peril." *Criswell v. Brentwood Hosp.* (1989), 49 Ohio App.3d 163, 165, 551 N.E.2d 1315, 1318.

Pursuant to R.C. 1745.01, any unincorporated association may "be sued as an entity under the name by which it is commonly known and called." Such a lawsuit, however, may only be maintained against an association for injuries resulting from the negligent acts of its agents if they are committed while within the scope of their authority. *Tanner v. Columbus Lodge No. 11, Loyal Order of Moose* (1975), 44 Ohio St.2d 49, 73 O.O.2d 233, 337 N.E.2d 625, syllabus.

Upon consideration of the foregoing, this court finds that appellant has not presented admissible evidence that is sufficient to raise a genuine issue of material fact as to whether she was in fear of real physical danger from PiKA as

a result of PiKA members' actions committed within the scope of their authority as members of the fraternity and, when construing the evidence that was before the trial court most strongly in favor of appellant, reasonable minds could only conclude that appellee PiKA is entitled to summary judgment as a matter of law on appellant's negligent infliction of emotional distress claim.

Accordingly, appellant's assignment of error is hereby found not well taken.

On consideration whereof, this court finds further that substantial justice has been done the party complaining, and the judgment of the Lucas County Court of Common Pleas is affirmed. Court costs of these proceedings are assessed to appellant.

*Judgment affirmed.*

GLASSER and SHERCK, JJ., concur.