**BELMAC HYGIENE, INC., Plaintiff,**

v.

**MEDSTAR, INC., Maximed, Inc. and Robert S. Cohen, Defendants.**

**MEDSTAR, INC., Plaintiff,**

v.

**BELMAC CORPORATION, Defendant.**

Nos. 94 Civ. 8897 (RWS), 95 Civ. 3152 (RWS).

United States District Court, S.D. New York.

Jan. 16, 1996.

Parker Chapin Flattau & Klimpli, Llp., New York City (Joel M. Wolosky, Sharon H. Stern, of counsel), for Belmac Corporation and Belmac Hygiene, Inc.

Leonard N. Shapiro, New York City, for Medstar, Inc.

## OPINION

SWEET, District Judge.

Both the plaintiff Belmac Hygiene, Inc. ("Belmac Hygiene") and the defendant and counterclaim plaintiff Medstar, Inc. ("Medstar") sought injunctive relief in this consolidated diversity action to resolve the disputes arising out of their agreement entered into as of March 11, 1994 ("the Agreement"). Upon all the prior proceedings and the trial before the court and upon the findings and conclusions set forth below, judgment will be entered upon the settlement of the judgment, and all injunctive relief will be denied.

### The Parties

Defendant, in the later filed action, Belmac Corporation ("Belmac"), is a publicly held Florida corporation having its principal place of business at One Urban Centre, Suite 550, 4830 West Kennedy Boulevard, Tampa, Florida 33609, engaged in the development, manufacture and sale of pharmaceutical products and related medical products. Belmac is the owner of all of the outstanding capital stock of Belmac Hygiene, a subsidiary formed by Belmac to enter in the Agreement.

Defendant Maximed, Inc. ("Maximed") is a Delaware corporation having its principal place of business at 535 Fifth Avenue, New York, New York 10017, which sought to develop a new controlled release drug delivery system ("Lotus RDC") by which women may take certain drugs intra-vaginally ("Drug Delivery System"), including a vaginal contraceptive originally known as Lotus Espernil and later known as Lotus 24. Defendant

Robert S. Cohen ("Cohen") is a citizen of the State of New York and is the founder and Chief Executive Officer of Maximed. Maximed owns all of the outstanding capital stock of defendant and counterclaim plaintiff Medstar, which was formed by Maximed to enter in the Agreement.

### Prior Proceedings

Belmac filed its complaint on December 9, 1994, alleging causes of action for injunction to prevent interference in the affairs of the partnership, for fraudulent inducement, negligent misrepresentation, breach of warranty and the covenant of fair dealing, and indemnification. By order to show cause signed March 30, Belmac sought preliminary injunctive relief. Medstar answered and counterclaimed on April 5 alleging material misrepresentation, fraud, failure of performance, breach of contract, as well as affirmative defenses. On May 5, 1995, Medstar then initiated an action against Belmac to enforce a guaranty of a Belmac obligation to fund the partnership created under the Agreement (the later filed action, *Medstar, Inc. v. Belmac Corporation,* 95 Civ. 3152). Belmac entered an answer reasserting its claims in the first filed action.

Discovery proceeded, pretrial conferences were held, and it was determined that the hearing on the injunctions requested and the trial on the merits would be consolidated pursuant to Rule 65(a)(2) Fed.R.Civ.P. The later filed action by Medstar was consolidated with the earlier filed action. The trial was held from August 21 through August 23, final argument was heard on October 25, 1995, and the action was considered finally submitted on October 27, 1995.

### The Facts

Belmac in 1993 sought to identify a pharmaceutical product with which to enter the United States market and to offset its past inability to do so. James Murphy, then president of MacroChem Corporation, now President and Chief Executive Officer of Belmac, learned of a product being developed by Maximed and Cohen known as the RDC and Lotus Drug Delivery System and the Lotus drug products, including a vaginal contraceptive known as Lotus 24.

In an effort to obtain financial backing, Maximed had prepared a 42–page business plan dated September 1, 1993 ("the Business Plan") that detailed Maximed's history and business, its patented technology, marketing strategy, its management, including its scientific advisory board and a statement of expected operations, including schedules of projected sales and gross revenues.

The Business Plan represented that Maximed had made a submission to the Federal Drug Administration ("FDA") in April 1991 and described the FDA regulatory process for drugs such as Lotus 24 at page 7, stating that:

> LOTUS 24, the Company's vaginal contraceptive product, the first intended for marketing, is in a unique regulatory position. The active ingredient in LOTUS 24, nonoxynol–9, has been determined as safe and effective under the guidelines set forth in the FDA Monograph on Vaginal Contraceptives. The monograph describes the parameters that all spermicidal preparations must meet and the Company's product meets or exceeds those requirements. The other components of the formulation are Generally Regarded As Safe (GRAS). As a result, there is no review requirements by the FDA.

The Business Plan further stated that:

> In April 1992, a notice of intention to market LOTUS 24 was filed with the FDA. The FDA has thirty days to respond with any objection before marketing may commence. No objections have been received by the company.

> \*　　\*　　\*　　\*　　\*　　\*

> Pursuant to the FDA monograph on vaginal contraceptives, Maximed's introductory product, a vaginal contraceptive, will be immediately marketed upon completion of funding.

The Business Plan also made representations regarding the identification of a manufacturer for Lotus 24, the existence and adequacy of an applicator and the lack of the need for capital expenditures, stating:

> The Company has identified a contract manufacturer to initially manufacture all of its products. Packaging for LOTUS 24

will contain 4 pre-filled, syringe type cardboard (environmentally safe) vaginal applicators. (Business Plan, p. 14);

Phase I First 6 mos. (i) commence production of LOTUS 24 (Business Plan, p. 15);

LOTUS 24 ... is projected as being sold in packages of 4 pre-filled cardboard vaginal applicators. Suggested retail price will be $6.00 ... Per package of 4 ... total Cost per Dozen $4.80. (Business Plan, p. 35);

there will be no capital expenditures for the project (Business Plan, pp. 31, 37–38); and

Sales for LOTUS 24 are expected to commence six months after funding. (Business Plan, p. 41).

Cohen had demonstrated products at MacroChem, and Murphy contacted Belmac's Chief Science Officer and Senior Vice President, Dr. Robert M. Stote ("Dr. Stote") to see if Belmac would be interested in the products. Dr. Stote contacted Maximed and arranged for a meeting with Cohen to discuss Maximed's business and products.

Thereafter, representatives of Belmac, including Dr. Stote, met with Cohen from January through March 1994 to discuss Maximed's Drug Delivery System and products and the possibility of entering into a business arrangement for their manufacture, marketing and sale. Although Belmac found merit in the product, it made plain to Cohen that Belmac was not interested in a development project and was desirous of entering into a business relationship involving at least one pharmaceutical product that was ready to be manufactured, marketed and sold.

Cohen on behalf of Maximed made representations consistent with, and in affirmance of, its written representations in the Business Plan which was given to Dr. Stote. Cohen declared that Lotus 24 was ready for marketing, that it would be marketed in "4 to 6 months" and affirmed the statements that Maximed had identified a manufacturer that was qualified to manufacture Lotus 24. Cohen stated that "all problems with the manufacturing had been worked out and they would sign a contract immediately upon funding," that "he had a manufacturer who could

manufacture the product ... they were ready to go," and that "as soon as he had funding and could sign the contract, they would start manufacturing," and that no further capitalization would be required.

Cohen reiterated the status of the product with the FDA as set forth in the Business Plan. Cohen told Dr. Stote prior to entering into the Belmac/Maximed Partnership Agreement that Maximed had discontinued consideration of one manufacturer, Healthcare Packaging Inc., months before he met Dr. Stote, that they had to find a new manufacturer, and that he was going to visit a new manufacturer, American Distilling & Manufacturing ("AD & M").

Maximed provided Belmac with a copy of a letter to the FDA dated April 15, 1992 with an attachment from Maximed, signed on its behalf by Cohen, notifying the FDA of Maximed's intention to market Lotus 24.

The FDA letter states, in pertinent part, that:

This letter will serve to notify you that Maximed Corporation intends to market LOTUS ESPERNIL (trade name), a nonoxynol–9 vaginal suppository, which conforms to the criteria of the Food and Drug Administration's (FDA) proposed monograph on Over–The–Counter (O–T–C) contraceptives ... In vitro testing of LOTUS ESPERNIL ... revealed that the product was spermicidal at forty (40) seconds and for up to twelve (12) hours. A copy of the summary report provided by the University of Miami School of Medicine is appended (Attachment I). The results of stability tests undertaken at the University of Kansas Medical Center reveal that the product has a shelf life of at least nine (9) months and is likely to have a shelf life of twenty-four (24) months. A copy of the summary stability report is appended (Attachment II). The labeling for LOTUS ESPERNIL is being provided to the O–T–C Labeling Group, for your review. A copy of the labeling is appended (Attachment III).

The three attachments referred to in the FDA letter were Attachment I—the spermicidal test, Attachment II—the purported stability test, and Attachment III—the labeling information. However, the only paper at-

tached to the copy of the FDA letter that Maximed provided to Belmac contained the labeling information which presumably was Attachment III, although it was not designated as such.

Cohen and Maximed represented to Belmac prior to entering into the Partnership Agreement that Lotus 24 would be marketed by September 1994. Cohen and Maximed had submitted a Belmac/Maximed Partnership Business Plan, from which Cohen and Maximed had removed pages which stated that the launch date for Lotus 24 was September 1994.

At a meeting held on March 3, 1994 between Belmac and Maximed, the purpose of which was to set forth the terms of the Belmac/Maximed Partnership Agreement, Belmac reiterated its desire to enter into a business venture involving pharmaceutical products that were market-ready. Certain figures for the cost of manufacturing were already contained in a draft of the proposed contract and Belmac asked Cohen during that meeting whether he could attest to the veracity of those figures. Cohen left the meeting and after a 15–minute interval returned and verified the cost figures.

Dr. Stote was aware that under the FDA approved monograph system, the FDA establishes rules for products containing ingredients that have been on the market for years and that have proven safety records. These rules mandate that a company planning to market a new product containing such an ingredient submit a letter to the FDA setting forth, among other things, its intention to market the product, stability testing and labeling information and other supporting documentation. The FDA has thirty days to respond with any objections before marketing may commence. If the FDA has not made any objections during the thirty-day period, the company is allowed to market the product.

Pivotal to an FDA determination of "no objection" to a submission pursuant to a monograph is the FDA's satisfaction that the product to be marketed has undergone proper stability testing. Stability testing has a technical and significant meaning when used in submissions to the FDA, as was known to Dr. Stote. The FDA requirements for stability testing are embodied in 21 Code of Federal Regulations ("CFR") 211.166 and require, among other things:

a written testing program, testing of the product in the same container-closure system as that in which the drug product is marketed and testing on a representative commercial batch. A representative commercial batch of a product means ten (10%) of the amount of product that the company is planning to sell.

Stability testing on a representative commercial batch in accordance with FDA regulations presupposes that there is a qualified manufacturer for the product.

The requirements of the United States Pharmacopeia ("USP"), a standard setting agency, are also authoritative and controlling when performing stability tests for FDA submissions and the USP criteria for stability testing include physical criteria which, in particular, would detect syneresis, which is fluid extrusion from the product, and microbiological criteria which detects, among other things, biological contamination, which is particularly important in a product like Lotus 24, a constituent of which was agar, a medium in which bacteria can be cultivated.

During the course of the litigation for the first time it was disclosed that Maximed had submitted a second letter to the FDA on April 15, 1992, identical to the FDA letter, but addressed to a different person at FDA with the additional representation that "the manufacturer of Lotus 24 is Healthcare Packaging, Inc. of Towaco, New Jersey. Their GMP number is 2245320." Cohen knew that on April 15, 1992 Healthcare Packaging was not the manufacturer of Lotus 24, and that the submission would not have been considered by the FDA without the name of the manufacturer and the GMP number. The FDA regulations and procedures were known to both Belmac and Maximed.

At trial Cohen initially testified that he didn't recall that prior to entering the Agreement that he reviewed the language in Belmac's 1993 annual report that stated that Belmac was experiencing negative cash flows. This testimony was impeached by his

deposition testimony where he admitted that prior to entering into the Partnership Agreement, he not only saw the 1993 annual report, he reviewed the provisions therein that Belmac was experiencing negative cash flows and that Belmac would be required to secure additional financing.

The Agreement entered into as of March 11 provided in Section 2.01 that the partners to the Agreement, Belmac and Medstar, would create a Florida partnership, the Belmac/Maximed Partnership (the "Partnership") to develop and sell the Lotus pharmaceutical products (Section 2.05). Section 3.02 provides for Belmac funding as follows:

Section 3.02. *Capital Contributions by Belmac.* Simultaneously with the execution and delivery of this Agreement, Belmac has contributed $1,000 in cash to the capital of the Partnership, the receipt of which is hereby acknowledged. In addition, from time to time, the Management Committee may determine that the Partnership requires additional funding to continue its operations, based upon plans, budgets and cash flow schedules agreed upon by the Management Committee, up to a maximum of $10,000,000. At such times, Belmac shall deliver to the Partnership such funds as a capital contribution to the Partnership.

Section 3.03(c) states the following representation:

(c) *Property.* Each component of the Property is either monographed, approved or generally recognized as safe by the U.S. Food and Drug Administration (the "FDA"). Espernil was submitted to the FDA for review and, after thirty (30) days, did not receive any comment by the FDA. Espernil is substantially the same as LO-TUS 24. There are no statements, citations or decisions by any governmental or regulatory body that any of the Property is defective or fails to meet any standards promulgated by any such governmental or regulatory body. There have been no recalls ordered by any such governmental or regulatory body with respect to any of the Property. To the knowledge of Medstar, Parent and Cohen, there is no (i) fact relating to any of the Property that may

impose a duty to recall any of the Property or a duty to warn customers of a defect in any of the Property, or (ii) latent or overt design, manufacturing or other defect in any of the Property.

Section 3.04 provided:

Section 3.04. *Indemnity.* All representations and warranties contained in Section 3.03 of this Agreement shall survive the execution of this Agreement and the dissolution of the Partnership. Medstar and Parent, jointly and severally, hereby indemnify and hold harmless Belmac and the Partnership from any and all losses, liabilities, costs and damages (or actions or claims in respect thereof) which Belmac or the Partnership may incur based upon any inaccuracy in any representation or warranty set forth in Section 3.03 above or relating to the Property arising prior to the date hereof.

Section 5.01 of the Agreement provided for the management of the Partnership as follows:

*The Management Committee.* A management committee (the "Management Committee") comprised of three representatives appointed by each of the Partners (each, a "Representative" and collectively, the "Representatives"), shall oversee the management and operation of the Partnership in such manner as a board of directors oversees the management and operation of a corporation. At least two Representatives of each Partner shall have no less than ten years experience in science, medicine, sales or production relating to the business of the Partnership. The initial Management Committee shall include Robert Cohen, as a Representative of Medstar and Donald E. Boultbee and Robert M. Stote as Representatives of Belmac. Notwithstanding the number of Representatives present at a meeting of the Management Committee, the Representatives of each Partner shall have three votes in the aggregate at all meetings of the Management Committee. The Management Committee shall act (i) by resolution adopted by majority vote of its members present at a meeting of the Management Committee, held either by telephone or in person, (ii)

without a meeting, by written consent of no less than two of the Representatives of each Partner, or (iii) in such other manner as the Representatives shall agree. Two (2) Representatives of each Partner shall constitute a quorum for meetings of the Management Committee. All meetings of the Management Committee shall be conducted at locations selected by its chairman. Each Representative not present at a meeting of the Management Committee shall be furnished with a written summary of any action taken at such meeting.

Representatives shall serve at the pleasure and at the appointment of the Partner they represent and shall serve until their successors, if any, have been appointed or until their earlier resignation or removal.

The only provision in the Agreement providing for termination and dissolution was contained in Section 7.01 as follows:

Section 7.01. *Dissolution.* Subject to the provisions of applicable law, the Partnership shall be dissolved upon the first of the following to occur:

(a) at any time after ten (10) years from the date of this Agreement, upon thirty (30) days notice of termination by either of the Partners;

(b) the dissolution or Bankruptcy of either of the Partners;

(c) unless waived by Belmac, the inaccuracy of any of the representations and warranties set forth in Section 3.03 hereof;

(d) the sale of all or substantially all of the Partnership's assets and properties; and

(e) the election of the Management Committee to terminate the Partnership.

The Agreement also provided that Florida law would govern in Section 8.05 and Section 8.12 constituted an integration clause.

Section 8.05. *Governing Law.* This Agreement has been executed and delivered in, and shall be governed by and construed in accordance with the laws (without regard to the conflict of law rules) of the State of Florida.

Section 8.12. *Entire Agreement.* This Agreement contains the entire agreement of the parties and supersedes all other representations, agreements and understanding, oral or otherwise, between the parties with respect to the matters contained herein.

After the Agreement was entered into as of March 11, 1994, a management committee was constituted consisting of three representatives from Belmac and Maximed. Maximed's representatives included Cohen who became the Partnership's. On April 29, 1994, it was determined, based upon Maximed's earlier representations, that a finished product would be available for clinical trials and other testing by June 15 and that Cohen was responsible for compliance with that deadline.

Belmac continued to fund all activities of the Partnership. In June 1994, Cohen advised the Partnership for the first time that the manufacturer for the applicator did not have the equipment to put the sealer on the applicator and that the manufacturer was unwilling to spend the money to get that sealer. Cohen then discussed various options whereby the Partnership would fund the equipment necessary to affix the sealer onto the applicator. Because of the prior representation concerning the absence of a need for additional capitalization, the Management Committee determined not to invest money on equipment until there was a proven product. Cohen, without authorization of the Management Committee, sent a letter to the manufacturer of the applicator setting forth options whereby the Partnership would fund the needed equipment.

By June 15, 1994, the Partnership had not received a representative commercial batch of Lotus 24 that was needed for clinical trials. Dr. Stote talked to Cohen, and they arranged to go to AD & M. On June 30, 1994, Dr. Stote, Cohen and others met with representatives of AD & M at its plant. At the meeting Dr. Stote learned for the first time that AD & M had no experience in manufacturing a product such as Lotus 24, was not equipped to manufacture Lotus 24, and had not indicated a willingness to purchase equipment necessary to do so. The manufacture of Lotus 24 requires an appropriate physical space known as a clean room,

kettles, mixers and filling apparatus, a heated holding tank, a cooling tunnel and wrapping and packaging machines. AD & M had none of these items.

At the June 30, 1994 meeting at AD & M, its representatives also brought to Dr. Stote's attention that the applicators that Cohen had supplied to them were unsatisfactory because they absorbed water from the formulation. In the course of the Partnership's search for a manufacturer qualified to manufacture the product, a significant syneresis (bleeding) problem was discovered with the Lotus Delivery System. In this regard, during the course of a visit with another proposed manufacturer, DPT, "it immediately became apparent to its representatives that syneresis had occurred, that is, there was water on top of the gel. It was immediately determined that this was not a satisfactory formulation at this point in time." The product was also bacterially contaminated.

At the July 1994 management meeting in Tampa, Florida, Cohen was advised not to spend money on unwarranted expenditures unless and until there was a proven product and on August 1, 1994, Belmac advised Cohen "not to spend any more money on any commercial aspect of the project until we know clearly the most likely date on which Lotus 24 could be launched onto the market." Belmac stated that in view of the cost containment measures invoked, Belmac "will vote not to hire anyone—and to severely limit consulting expenses—until the product is proven." Belmac further stated that it "has to insist on a very rigorous control of expenses. This includes a freeze on all hiring, and avoidance of consulting fees, etc. until the product is proven. We cannot support hiring, or further payments, to Doug Moore at this time."

By letter dated August 3, 1994, Belmac again admonished Cohen that he would have to eliminate expenditures as a result of Cohen's misrepresentations about the market readiness of Lotus 24 prior to entering into the Partnership Agreement. In pertinent part, the letter stated:

We have to take an extremely hard-nosed position to cut expenses and absolutely avoid any new expenses until we can truly demonstrate that we have a product ... This translates into the following. Belmac will insist on a hiring freeze. No expenditures should be committee or incurred which do not directly relate to proving the product. All other activities should be put on hold until that time. This may mean we lose Doug Moore which is a shame considering his expertise, but we simply cannot afford such continued expenditures prior to proving this product.

Again, by letter dated October 7, 1994, Belmac advised Cohen of the urgent need for cost containment as, contrary to Maximed's and Cohen's representations prior to entering into the Partnership, Lotus 24 was not a viable product. In this letter, Belmac advised Cohen:

The basis for many of the decisions made in May/June and subsequently were based on continued reassurances that deadlines would be met as discussed and agreed upon. This includes your premature increase in salary as well as a salary adjustment for Doug Moore. Other commitments to personnel and outside vendors were in accord with milestones agreed upon by the Committee, but which have not been met ... In good faith, your salary was increased based on your continued reassurance that manufacturing was well in hand.

The attempts to remedy the syneresis and contamination problems and the lack of a qualified manufacturer and viable applicator resulted in the Partnership's incurring additional time, money and expertise in developing and providing a viable product. Because of the applicator problem, the Partnership had to incur the time and expense of engaging a designer and patent counsel and of preparing and evaluating prototype applicators. The syneresis problem required the hiring in November 1994 of another scientist, Dr. Lloyd Allen, who worked through March 1995 on reformulating and retesting Lotus 24. It also required the continued retention of Dr. Kinsey, who worked through March 1995 on reformulating and retesting Lotus 24. These problems not only prevented the Partnership from meeting the deadlines that

it had previously established, it set back any marketing of Lotus 24.

All parties agreed that stability testing in accordance with the FDA guidelines would have required testing of Lotus 24 in the applicator and that the USP criteria would have required testing the physical and microbial characteristics of Lotus 24. Had proper stability testing been performed by Maximed prior to March 1994, the problems with the applicator, syneresis and contamination would have been revealed, and Belmac would not have entered into the Partnership.

Notwithstanding the difficulties in the product, Belmac continued to fund the Partnership through the end of November 1994. At the end of November 1994, Belmac made a determination only to fund the Partnership's research and development activities. On November 15, Belmac stopped salary payments.

Cohen continued to spend money on items other than improving the product through December 31, 1994. As Dr. Stote testified:

He continued to have the salaries paid for Mr. Moore; there were travel expenses that were incurred. He had hired an administrator that was working in his office and it was hard to justify a full-time administrator when all we had was essentially R and D work continuing, and there were a lot of expenses in regard to communications that were being incurred . . . In regard to sales and advertising, Mr. Cohen had wanted to put an ad in some sales magazines to counteract our competitors. That would have been an expenditure of $5,000, but we prevailed in convincing him that wouldn't be appropriate since we did not have a product. (Tr. 57).

In early December 1994, Cohen directed Drs. Kinsey and Allen in writing not to discuss any of the scientific information pertaining to the Partnership's R & D activities with Dr. Stote, and without approval of the management committee, advised Dr. Stote that Cohen was taking charge of the manufacturing process. Dr. Allen, who at that time was involved in significant reformulation activities, did not provide Dr. Stote with any further information about the progress of the scientific activities of the Partnership. By late December 1994 the parties were approaching an impasse with no provision in the Agreement for resolution.

The partners then had a series of meetings and conversations seeking to resolve the impasse. Although Belmac had prepared and filed its complaint on December 9, it refrained from service and continued discussion. The partners on December 19 met, and there were recriminations, including a declaration by Maximed that Belmac had defaulted with respect to the agreed upon salary funding. Notwithstanding, the parties agreed to a payment of all salaries through November 1994 and the deferment of salaries and fees starting on December 1 until the first commercial sales of the product. Belmac would continue to fund development with full committee approval. The portion of the New York office attributable to Maximed would be maintained.

On December 23, 1994, Cohen sent a memo to the participants in the December 19 meeting confirming the payment and the deferment but adding that the deferment would be repaid with a ten percent stipend by April 1, 1995 or upon the successful completion of a clinical trial. Cohen made calls to Belmac shareholders to explore the possibility of a control contest to oust existing Belmac management.

On January 4, Dr. Stote confirmed his understanding of the action taken at the management meeting, somewhat more detailed than Cohen's, but confirming the deferment terms agreed upon.

The complaint was served later in January, but notwithstanding, another effort at resolution was made on March 7, 1995 as a consequence of which an agreement was prepared by an officer of Belmac. Cohen declined to go forward. The litigation then proceeded.

As found above, Attachment II to the FDA letter the stability test became significant in terms of the representations concerning the FDA. While Cohen testified that it was Trial Exhibit P that he sent to the FDA and gave to Dr. Stote, Cohen admitted that he handwrote the words "Attachment II" on the document within a month prior to trial. During his deposition, Cohen testified that in

Maximed files, Attachment II was not annexed to the FDA letter.

Cohen sent two letters to the FDA, although he only gave one of them to Belmac. Both letters were identical except that in one letter, Cohen additionally represented that the manufacturer of Lotus 24 (then known as Lotus Espernil) was Healthcare Packaging of Towaco, New Jersey and included Healthcare Packaging's good manufacturing practices number.

Cohen admitted that when he wrote the FDA letter he knew that the references therein to stability tests were not stability tests that were required by the FDA. However, he never informed Belmac nor the FDA that the stability tests referred to in the FDA letter were not done in accordance with FDA requirements.

At trial, Cohen testified that he told Dr. Stote prior to entering into the Partnership Agreement about two manufacturers, AD & M and Healthcare Packaging, and that he did not tell Dr. Stote that either of them or both of them were willing or qualified to manufacture Lotus 24. However, he wrote to Belmac on August 10, 1994 in which he stated that he told Belmac "that [he] had identified two qualified contract manufacturers willing to enter into a production agreement with us." Neither AD & M nor Healthcare Packaging were qualified or willing to manufacture Lotus 24. Cohen was not a credible witness on the subject of the FDA submissions and his pre-Agreement knowledge concerning Belmac's finances.

### Conclusions of Law

### Jurisdiction

There is no controversy between the parties concerning jurisdiction which has been established under Section 1332, Title 28. Nor is there any question that the merger clause would not bar a fraudulent inducement claim.

### Choice of Law

■ In this diversity action, New York courts look to the choice of law rules of New York in determining whether or not to enforce a contractual choice of law provision. New York's choice of law rules dictate that

Florida law apply here. As stated in *Hutner v. Greene,* 734 F.2d 896, 899 (2d Cir.1984) (quoting *Intercontinental Planning, Ltd. v. Daystrom, Inc.,* 24 N.Y.2d 372, 382, 300 N.Y.S.2d 817, 248 N.E.2d 576 (1969)):

> New York courts apply a "paramount interest" test to choice of law issues involving contractual disputes. Under such a test, the law of the jurisdiction having the greatest interest in the litigation will be applied and ... the facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict.

The application of Florida's law regarding the breach of the Agreement and allegations of fraudulent inducement is consistent with a choice of law analysis. "Under New York law, great deference is to be given to a contract's designation of the law that is to govern disputes arising from the contract." *Zerman v. Ball,* 735 F.2d 15, 19–20 (2d Cir. 1984); *See also, Punzi v. Shaker Advertising Agency, Inc.,* 601 So.2d 599 (Fla. DCA 1992).

The Agreement expressly provides for the application of Florida law. Florida is the situs of the impact of the alleged fraud by Belmac and Belmac's inquiry. The Partnership Agreement was formed in Florida and was executed there; it is a Florida partnership. Finally, Belmac, the funding partner is a Florida corporation.

There being no objection to the application of Florida law and every reason to apply it, Florida law shall govern this action.

### No Misrepresentation in the Warranties Has Been Established

The statements in the warranties are literally true, but the underlying assumption was false, although not actionable.

Espernil was submitted for review, no comment was received, no statements were made, no recalls ordered, and there is no fact which has been established by Belmac, known to Maximed, that would impose a duty to recall or warn, or constitute a latent or overt defect. Notwithstanding the literal truth, the facts also establish that the FDA submission was flawed in the absence of appropriate stability tests, a known manufacturer and commercial batches of the product.

However, these flaws, known to Cohen, did not constitute a breach of the warranties contained in Section 3.03(c) quoted above.

### Belmac Had a Duty to Investigate

Belmac, through Dr. Stote, was experienced in the methodology of clearance with the FDA and assumed, sad to say, that Attachment II, missing from his copy of the FDA, was in fact an appropriate stability test, which, as found above, it was not. Further, of course, Dr. Stote did receive the enclosure, not so identified, as part of the Business Plan.

Proceeding in good faith as he was, Dr. Stote accepted the FDA letter which appeared appropriate in form. Only a review of Attachment II would have revealed the inadequacy of the purported stability test. Stote never requested the attachments and was unaware that the paper included in the Business Plan constituted the attachment. The assumption that all was as it appeared to be did not discharge his duty to investigate the representation made prior to the execution of the Agreement.

According to Florida law, "a party who relies on misrepresentation must show it exercised some diligence in investigating the misrepresentation, unless it is shown that the fraudulent party had exclusive or superior knowledge, or prevented further investigation." *Adams v. Prestressed Systems Industries*, 625 So.2d 895, 896 (1st Dist. DCA 1993). In this case it is apparent that Dr. Stote was familiar with the FDA process and through the exercise of minimal effort could have disclosed the problem with the FDA submission. Acting on behalf of the investors, he had at least this duty. The failure to do this is not excusable and does not allow Belmac to claim fraudulent inducement successfully.

While Belmac relies on the *Besett v. Basnett*, 389 So.2d 995 (Fla.1980) case for the rule that parties are entitled to rely on the other's representations, the Florida courts have refined the position since 1980 and have routinely distinguished the *Besett* case which involved a seller with superior knowledge of a product defect. In *Besett*, the Court held that a "recipient may rely on the truth of a representation, even though its falsity could have been ascertained had he made an investigation, unless he knows the representation to be false or its falsity is obvious to him." *Id*, at 998. This case fits within the confines of *Besett*. There was no investigation required for Belmac to understand the falsity of the representation. All they had to do was read the document submitted to them, ask for the missing attachment and read that once acquired. This hardly required an all out investigation.

Even if "investigation" was not required pursuant to *Besett*, the Florida cases since *Besett* have clarified the position of the Florida courts. *See e.g., Nicholson v. Ariko*, 539 So.2d 1141, 1142 (5th Dist. DCA 1989) (holding that "an experienced business man" could not successfully allege fraud, where in addition to other defects in his claim, "[he] failed to explain ... [why] he did not insist on a copy of [the significant document] and read it for himself." The Court went on to say that "[h]is reliance on Nicholson's interpretation was not shown to be reasonable or justified, as required to prove fraud."); *Uvanile v. Denoff*, 495 So.2d 1177 (4th Dist. DCA 1986) ("The doctrine announced in *Besett v. Besett [Basnett]* [citation omitted] does not permit recovery to the recipient of a fraudulent misrepresentation to blindly rely upon it in every case. Considering the history of the parties relationship to each other, Denoff's distrust of Uvanile, the negotiations that proceeded the ultimate agreement, Denoff's complete knowledge of the corporate affairs ... Denoff was not justified in relying upon the misrepresentation.")

Similarly in this case when a large amount of investor capital was at stake, where the mechanics of the FDA process were well known to Dr. Stote and where the effort required to uncover the misrepresentation was as simple as requesting and reading the missing crucial attachment, Belmac was not justified in relying upon the misrepresentation that the product was market-ready. In addition, Belmac's continued dealings with Medstar after the problems were known to them, weakens their case of fraud in the first instance.

For the reason that the reliance was not reasonable, the claim for negligent misrepresentation must fail. In order to prevail on a claim of negligent misrepresentation, four elements must be proven: (1) there was a misrepresentation of material fact; (2) the representor either knew of the misrepresentation, made the misrepresentations without knowledge of its truth or falsity, or should have known the representation was false; (3) the representor intended to induce another to act on the misrepresentation; (4) injury resulted to a party acting in justifiable reliance upon the misrepresentation. *Florida Women's Medical Clinic, Inc. v. Sultan,* 656 So.2d 931, 933 (4th Dist. DCA 1995). In accordance with the discussion above, the reliance was not reasonable. Belmac has thus failed to prove the claim.

### The December 19 Agreement Was The Last Agreement Between the Parties

The last time that the parties were in agreement concerning the affairs of the Partnership was on December 19 at the meeting called to see if the differing versions of events could be reconciled. Under the agreements reached at that meeting, Belmac undertook to pay the salaries due from November 15 to December 1, to continue to fund the development of the property, and to continue to support the New York office. The officers of the Partnership would defer their salaries until a commercial product had been developed.

### Belmac Has Performed its Obligations Under the Agreement

Maximed has alleged that Belmac has failed to perform its obligation, set forth in the Agreement to fund the Partnership up to the amount of $10 million and has further alleged that Belmac is incapable of such performance, citing its recent 10Q filing. However, the obligation under the Agreement is to make such contributions as are determined by the Management Committee. As found above, the only determination of the Management Committee that remains unfunded is the obligation to pay salaries for the last two weeks of November 1994. Indeed, there is no claim for specific performance by Maximed and the breach, such as

it is, is not material in view of the December 29 agreement to defer salaries from December 1, 1994.

### The Affairs of the Partnership Are at a Stalemate

Belmac has moved for a dissolution of the Partnership citing accurately the law for dissolution in the case of a breach of the Agreement. Having found no breach, however, the law is inapplicable.

The Agreement contains no mechanism for the resolution of a difference of opinion between the two partners as to the Agreement, Belmac and Maximed, and neither of the parties has presented any authority or method by which this stalemate can be broken other than through the agreement of the partners. In the absence of any grounds for rescinding the Agreement, and none have been established on this record in view of the conclusions stated above, the parties are condemned to the present deadlock.

### Conclusion

All claims and counterclaims as set forth in the pleadings in both actions will be dismissed without costs. Settle judgment on notice.

It is so ordered.