**BELMAC HYGIENE, INC., Plaintiff–Appellant, Cross–Appellee,**

v.

**BELMAC CORPORATION, Counter–Defendant–Appellant, Cross–Appellee,**

Medstar, Inc.; Maximed, Inc.; Robert S. Cohen, Defendants–Counter–Claimants–Appellees, Cross–Appellants.

Nos. 911, 1332, Dockets 96–7330, 96–7374.

United States Court of Appeals, Second Circuit.

Argued Feb. 26, 1997.

Decided Aug. 22, 1997.

**836**

Sharon H. Stern, New York City (Joel M. Wolosky, Parker, Chapin, Flattau & Klimpl, New York City, of counsel), for Plaintiff–Appellant, Cross–Appellee.

Leonard N. Shapiro, New York City, for Defendants–Counter–Claimants-Appellees, Cross–Appellants.

Before: VAN GRAAFEILAND, MESKILL and CABRANES, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

Belmac Hygiene, Inc. appeals from a judgment of the United States District Court for the Southern District of New York which followed a non-jury trial before Judge Sweet. The judgment dismissed Belmac Hygiene's suit for breach of contract, fraudulent inducement and negligent misrepresentation against its partner in a joint venture, Medstar, Inc., Medstar's parent, Maximed, Inc., and Maximed's principal shareholder, Robert Cohen. Defendants cross-appeal the dismissal of their counterclaim alleging fraud and breach of contract by Belmac Hygiene. Medstar also appeals the dismissal of its jointly tried claim of breach of an agreement of guaranty against Belmac Hygiene's parent, Belmac Corporation. The district court's opinion is reported at 910 F.Supp. 966 (1996).

**THE FACTS**

Robert Cohen, founder and CEO of Maximed, co-owned certain patents relating to an intra-vaginal drug delivery system known as "Lotus RDC." The system was believed to have many practical applications, including its use as a vaginal contraceptive eventually named "Lotus 24."

To obtain financial backing for the development and production of its Lotus products, Maximed produced a 42–page business plan dated September 1, 1993 (the "Business Plan") to attract potential investors. Among other things, the Business Plan detailed Maximed's history and business, its patented technology, its marketing strategy, its financial projections and its management (including a scientific advisory board). The Business Plan stated that Maximed had filed a notice of intention to market Lotus 24 with the Food and Drug Administration ("FDA") in April 1992 and made certain representations about the FDA approval process for Lotus 24, specifically the absence of a need for FDA review:

> LOTUS 24, the Company's vaginal contraceptive product, the first intended for marketing, is in a unique regulatory position. The active ingredient in LOTUS 24, nonoxynol–9, has been determined as safe and effective under the guidelines set forth in the FDA Monograph on Vaginal Contraceptives. The monograph describes the parameters that all spermicidal preparations must meet and the Company's product meets or exceeds those requirements. The other components of the formulation are Generally Regarded As Safe (GRAS). As a result, there is no review requirement by the FDA. In April, 1992, a notice of intention to market LOTUS 24 was filed with the FDA. The FDA has thirty days to respond with any objections before marketing may commence. No objections have been received by the company.

The Business Plan also stated that: (1) Maximed had identified a manufacturer for all of its products, including Lotus 24 and its applicator; (2) pursuant to the relevant FDA monograph, Lotus 24 would "be immediately marketed upon completion of funding"; (3) there were "no significant initial capital expenditures"; and (4) sales were expected to commence six months after funding.

In 1993, Belmac Corporation ("Belmac") was seeking a pharmaceutical product to market. James Murphy, then-president of MacroChem Corporation and later Belmac's president and CEO, learned of the Lotus RDC products being developed by Maximed. Murphy contacted Belmac's chief science officer and senior vice-president, Dr. Robert M. Stote, who in turn arranged to meet with Cohen to discuss Maximed's products. In January 1994, before meeting with Cohen,

Stote requested certain information, including:

All pertinent information on the Lotus RDC method of drug delivery

Patents

FDA submissions/correspondence

Regulatory opinions

Manufacturing methods

Formulation work/Stability data

Scientific data re: in vitro/in vivo-anti viral, anti bacterial, anti fungal activity

All clinical data

In response, Maximed provided Belmac with the Business Plan, copies of its patents and a copy of a letter to the FDA's over-the-counter labeling group, dated April 15, 1992. The FDA letter reads in part:

This letter will serve to notify you that Maximed Corporation intends to market LOTUS ESPERNIL (trade name), a nonoxynol–9 vaginal suppository, which conforms to the criteria of the Food and Drug Administration's (FDA) proposed monograph on Over–The–Counter (O–T–C) contraceptives....

In vitro testing of LOTUS ESPERNIL in accordance with the International Planned Parenthood Federation (IPPF) Agreed Test For Total Spermicidal Power revealed that the product was spermicidal at forty (40) seconds and for up to twelve (12) hours. A copy of the summary report provided by the University of Miami School of Medicine is appended (Attachment I).

The results of stability tests undertaken at the University of Kansas Medical Center, reveal that the product has a shelf life of at least nine (9) months and is likely to have a shelf life of twenty-four (24) months. A copy of the summary stability report is appended (Attachment II).

The labeling for LOTUS ESPERNIL is being provided to the O–T–C Labeling Group, for your review. A copy of the labeling is appended (Attachment III).

The only item attached to the copy of the letter provided to Belmac was the labeling attachment, but it was not marked as "Attachment III." Moreover, although Stote asked Cohen for the stability test results (referred to in the letter as "Attachment II"), Cohen did not provide them.[1]

Between January and March 1994 Belmac representatives, including Stote, met with Cohen to explore the possibility of a business arrangement to manufacture and sell Lotus RDC products. Belmac made clear that it was not interested in a development project but wished only to enter into a business relationship involving at least one product that was ready to be manufactured, marketed and sold. During these meetings Cohen made certain oral representations consistent with the Business Plan, including (1) that Lotus 24 was ready for marketing; (2) that it would be marketed in 4 to 6 months; (3) that Maximed had identified a manufacturer that was qualified to produce the product; (4) that a contract with the manufacturer could be signed as soon as Maximed obtained financing; and (5) that no further capitalization would be required. He also verified certain manufacturing cost figures contained in the draft partnership agreement.

On March 11, 1994, Belmac and Maximed, through their wholly-owned subsidiaries, Belmac Hygiene and Medstar, entered into a Partnership Agreement pursuant to which they agreed to develop and sell the Lotus RDC products, beginning with the Lotus 24 contraceptive device. The partnership was to be overseen by a management committee composed of three representatives of each of the two partners. Cohen, one of Maximed's representatives, became the Partnership's CEO. Under the terms of the Partnership Agreement Belmac Hygiene pledged to contribute $1,000 initially to the venture's capital and up to $10,000,000 in additional funding as deemed necessary by the management committee, and Medstar agreed to contribute its Lotus technology, including the relevant patents. The Agreement also contained a guar-

---

1. The data were attached to the Business Plan, although they were not identified as such. The district court also found that a second, almost identical, letter was sent by Cohen to the FDA but not provided to Stote. That letter identified Healthcare Packaging, Inc. of New Jersey as the manufacturer of Lotus 24.

anty by Belmac of Belmac Hygiene's funding obligations.

During the next few months Belmac funded all partnership activities. A target date of June 15 was set for a finished product to be ready for clinical trials and other testing. Problems began to develop, however, when Cohen advised the partnership that the manufacturer did not have the equipment to put a required sealer on the cardboard applicator and was unwilling to spend the money to purchase the equipment. Based on Maximed's prior representations that no additional capitalization would be required, the management committee declined to invest in new equipment until a proven product had been developed. Consequently, a representative batch of Lotus 24 for clinical testing was not available by the June 15th target date. On June 30, the manufacturer informed Cohen and Stote that "[it] had no experience in manufacturing a product such as Lotus 24, was not equipped to manufacture Lotus 24, and had not indicated a willingness to purchase equipment necessary to do so." 910 F.Supp. at 972.

Additional troubles developed as the partnership sought a qualified manufacturer for Lotus 24. For example, it was discovered that the Lotus Delivery System had a significant "syneresis" or "bleeding" problem. Moreover, samples of the product were found to be bacterially contaminated. Attempts to solve these problems resulted in further delays and expense. Although Belmac continued to fund partnership activities through November 1994, by the end of that month it decided to fund only research and development activities pending the development of a proven product. On November 15, Belmac stopped salary payments altogether. Meanwhile, Cohen continued to spend partnership funds on other unapproved items through December 31, 1994. Cohen also directed two other scientists on the project not to release any information to Stote regarding the partnership's scientific activities.

On December 9, 1994, Belmac Hygiene filed its complaint against Medstar, Maximed and Cohen, alleging fraudulent inducement, negligent misrepresentation and breach of warranty. Belmac Hygiene did not serve the complaint on defendants until January 1995, when the parties' efforts at resolving their differences had failed and a successful clinical trial appeared unlikely. Defendants counter-claimed alleging fraudulent misrepresentation and breach of contract by the plaintiff. Shortly thereafter, Medstar filed a separate action against Belmac Corporation alleging breach of its funding guaranty agreement. The cases eventually were consolidated by the district court.

Belmac Hygiene moved for a preliminary injunction, and the hearing on the motion was consolidated with the trial on the merits pursuant to Fed.R.Civ.P. 65. The district court dismissed the claims of all parties. As to plaintiff's fraudulent inducement claim, the district court held that Belmac Hygiene failed to demonstrate that any reliance it placed on Cohen's misrepresentations was reasonable. The court also ruled that Belmac Hygiene failed to show that any warranty given by Cohen or Maximed was breached. Finally, the district court held that Medstar failed to show any breach by Belmac Hygiene of its funding agreement and dismissed Medstar's claim against Belmac for breach of its guaranty agreement.

## DISCUSSION

■ This case comes to us in a peculiar posture. A federal court sitting in diversity must follow the choice-of-law rules of the state in which suit is brought. *Reeves v. American Broadcasting Companies, Inc.*, 719 F.2d 602, 605 (2d Cir.1983). In the instant case, that state is New York. New York uses the "paramount interest" or "interests analysis" approach pursuant to which the law of the jurisdiction having the greatest interest in the litigation will be applied. *Istim, Inc. v. Chemical Bank*, 78 N.Y.2d 342, 346–47, 575 N.Y.S.2d 796, 581 N.E.2d 1042 (1991). Here, the state with the greatest interest in the litigation is Florida, and the district court explained why this was so. 910 F.Supp. at 975. Moreover, no one has objected to the application of Florida law.

■ It is surprising, therefore, that the brief of the Medstar interests is completely barren of references to Florida law. Not a single Florida case is cited. In contrast, the

Belmac briefs contain over twenty citations to state and federal cases dealing with Florida law. Of course, the district court cited a number of cases which it believed supported its decision. However, although we may not set aside any findings of fact by the district court unless they are clearly erroneous, we review *de novo* its interpretation of Florida law. *Salve Regina College v. Russell*, 499 U.S. 225, 239, 111 S.Ct. 1217, 1225, 113 L.Ed.2d 190 (1991); *Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1574–75 (2d Cir.1994). What's more, in making our *de novo* review, we are not required to give deference to the district court's interpretation. *In re Males*, 999 F.2d 607, 609 (2d Cir.1993); *General Motors Acceptance Corp. v. Rupp*, 951 F.2d 283, 285 (10th Cir. 1991). In short, we interpret the law as if we were a district court viewing it for the first time. While we are satisfied that we have reached the correct result, our work would have been easier if we had the benefit of adequate briefing by both parties.

■ To prevail on a claim of fraudulent inducement under Florida law, a party must establish:

(1) a false statement concerning a material fact; (2) knowledge by the person making the statement that the representation is false; (3) the intent by the person making the statement that the representation will induce another to act on it; and (4) reliance on the representation to the injury of the other party.

*Lance v. Wade*, 457 So.2d 1008, 1011 (Fla. 1984).

■ The district court found that the first three elements had been met here, findings with which we fully agree. For example, the district court found that Cohen knew when he wrote the letter to the FDA—a copy of which later was provided to Stote—that the "stability testing" to which he referred was not the testing required by the FDA. This misrepresentation gains added significance when read in conjunction with the Business Plan's statement that the FDA had "no objection" to the Lotus 24 submission, which indicated to Stote "the FDA's satisfaction that the product to be marketed has undergone proper stability testing." 910 F.Supp. at 970. As the district court found, "[s]tability testing has a technical and significant meaning when used in submissions to the FDA, as was known to Dr. Stote." *Id.* Specifically, the court found that the FDA requirements for stability testing include, among other things:

a written testing program, testing of the product in the same container-closure system as that in which the drug product is marketed and testing on a representative commercial batch. A representative commercial batch of a product means ten (10%) of the amount of the product that the company is planning to sell.

910 F.Supp. at 970 (citing 21 C.F.R. § 211.166). Thus, "[s]tability testing on a representative commercial batch in accordance with FDA regulations presupposes that there is a qualified manufacturer for the product." *Id.* In addition to these written misrepresentations, the district court correctly found that Cohen made several false statements about the existence of a qualified manufacturer to produce Lotus 24.

Taken together, these misrepresentations were material because they misled Belmac as to Maximed's ability to timely market Lotus 24. That this was a central purpose of the partnership was made clear by Belmac's consistent position that it did not wish to enter into a partnership for the development of a new product. We agree with the district court that there was reliance in fact on these misrepresentations. As the district court found, "[h]ad proper stability testing been performed by Maximed prior to March 1994, the problems with the applicator, syneresis and contamination would have been revealed, and Belmac would not have entered into the Partnership." *Id.* at 974.

We disagree, however, with the district court's legal conclusion that Belmac's reliance did not meet the threshold necessary to establish a claim of fraudulent inducement. The district court based this conclusion on its mixed factual-legal determination that Stote "did not discharge his duty to investigate the representation [regarding the adequacy of the stability tests] made prior to the execution of the Agreement." *Id.* at 976. More

specifically, the district court held that Stote had the duty to request and examine the missing "Attachment II" to the FDA letter, which "would have revealed the inadequacy of the purported stability test." *Id.* We conclude that no such crucially determinative duty existed.

In *Besett v. Basnett,* 389 So.2d 995, 998 (Fla.1980), the Florida Supreme Court adopted § 540 of the *Restatement (Second) of Torts,* which provides that:

> The recipient of a fraudulent misrepresentation of fact is justified in relying upon its truth, although he might have ascertained the falsity of the representation had he made an investigation.

The Court said that the purpose of this rule is to prevent "[a] person guilty of fraud ... [from] us[ing] the law as his shield." *Id.* at 998. While recognizing that the law should not "encourage negligence," the Court struck the balance in favor of the intentionally deceived because "negligence is less objectionable than fraud." *Id.*

Although, as the district court observed, several lower Florida courts have departed somewhat from the Supreme Court's holding in *Besett* the district court describes these departures as "refine[ments]," 910 F.Supp. at 976, it is not our prerogative to do so. It is self-evident that "the highest court of the state is the final arbiter of what is state law," *West v. A.T. & T. Co.,* 311 U.S. 223, 236, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940), and, of course, "[a] federal court sitting in diversity must follow the law directed by the Supreme Court of the state whose law is found to be applicable." *Plummer v. Lederle Labs.,* 819 F.2d 349, 355 (2d Cir.), *cert. denied,* 484 U.S. 898, 108 S.Ct. 232, 98 L.Ed.2d 191 (1987).

The danger in relying upon so-called refinements is made apparent in the instant case by the Florida Supreme Court's opinion in *Gilchrist Timber Co. v. ITT Rayonier, Inc.,* 696 So.2d 334 (Fla.1997), which was handed down subsequent to the decision below. Referring to its decision in *Besett,* the Court said:

> In addressing a fraudulent misrepresentation in *Besett,* we held that "a recipient may rely on the truth of a representation, even though its falsity could have been

ascertained had [the recipient] made an investigation, unless [the recipient] knows the representation to be false or its falsity is obvious." 389 So.2d at 998. In reaching that conclusion, we specifically adopted the Restatement of Torts' position contained in sections 540 and 541, which apply to fraudulent misrepresentations. Further, our opinion in *Besett* dealt with a factual situation involving the intentional misrepresentation of a vendor to a purchaser of real property. In fact, in discussing the intentional misrepresentation, we stated:

> > A person guilty of fraud should not be permitted to use the law as his shield. Nor should the law encourage negligence. However, when the choice is between the two—fraud and negligence—negligence is less objectionable than fraud. Though one should not be inattentive to one's business affairs, the law should not permit an inattentive person to suffer loss at the hands of a misrepresenter.

> *Id.* While we were discussing the negligence at issue in *Besett* in the context of the negligence of the purchaser, the axiom is still the same—"negligence is less objectionable than fraud." Simply stated, the policy behind our holding in *Besett* is to prohibit one who purposely uses false information to induce another into a transaction from profiting from such wrongdoing.

*Id.* at 336–37 (alterations in original).

Several federal courts in the Eleventh Circuit, which includes the State of Florida, have recognized that the *Besett* opinion is the correct statement of Florida law. *See Banco Nacional De La Vivienda v. Cooper,* 680 F.2d 727, 730 (11th Cir.1982), where the Court said:

> *Besett,* therefore, governs this case. Reviewing the record, we conclude that the district court erroneously instructed the jury that if "the plaintiff could have ascertained the truth of the matter by making a reasonable inquiry or investigation under the circumstances presented but failed to do so, then it cannot be said that it justifiably relied upon such misrepresentations."

See also *American Eagle Credit Corp. v. Select Holding, Inc.,* 865 F.Supp. 800, 812 (S.D.Fla.1994).

Instead of following these Florida-oriented courts, the district court went its own way in restating Florida law. "According to Florida law," it said, " 'a party who relies on misrepresentation must show it exercised some diligence in investigating the misrepresentation, unless it is shown that the fraudulent party had exclusive or superior knowledge, or prevented further investigation,' " citing an intermediate appellate court as authority. 910 F.Supp. at 976. Citing other lower Florida court authorities, the district court continued, "[e]ven if 'investigation' was not required pursuant to *Besett,* the Florida cases since *Besett* have clarified the position of the Florida courts." *Id.* We hold these statements of law to be error. Under the guise of "clarification" the lower courts cited by the district court are in fact amending. Clearly the decisions are in conflict. The Florida Supreme Court has made it quite clear that "[i]n the event of a conflict between the decision of a District Court of Appeal and [the Supreme Court], the decision of [the Supreme Court] shall prevail until overruled by a subsequent decision of [the Supreme Court]." *Hoffman v. Jones,* 280 So.2d 431, 440 (Fla.1973).

For all of the foregoing reasons, the portion of the judgment below that dismisses Belmac Hygiene's claim of fraud is vacated and this issue is remanded to the district court for further proceedings in accordance with this opinion. However, for the reasons stated by the district court, those portions of the judgment which dismiss Belmac Hygiene's contract claim for breach of warranty, the defendants' counterclaim for fraud and breach of contract, and Medstar's action for breach of an alleged guaranty agreement, i.e., all the remaining claims of all parties, are affirmed.