**ROBOTIC VISION SYSTEMS, INC., Plaintiff,**

v.

**CYBO SYSTEMS, INC., a/k/a Cybot Systems, Inc., Defendant.**

**No. 92 cv 5012.**

United States District Court, E.D. New York.

Sept. 15, 1998.

Martin Stein, Parker, Duryee, Rosoff & Haft, New York City, for Plaintiff.

Larry P. Schiffer, Werner & Kennedy, New York City, Alan Berliner, Carlile, Patchen & Murphy, Columbus, OH, for Defendant.

### Memorandum & Order

GERSHON, District Judge.

Robotics Vision Systems, Inc. ("RVSI") is a Delaware corporation that, prior to September 30, 1990, made and sold adaptive robotic welding systems, which are preprogrammed robots designed to weld pieces of metal used in manufacturing tanks and excavators. Cybo Systems, Inc. ("Cybo") is an Ohio corporation that sells robots and robot systems. In September 1990, RVSI and Cybo entered into a contract (the "Agree-ment") that provided for the sale of certain assets to Cybo in exchange for $537,000.

RVSI filed this action against Cybo in October 1992, to recover the balance of the purchase price, $156,000, and other monies owed pursuant to the Agreement. Cybo's answer asserts nine counterclaims for breach of contract and fraud and seeks, among other things, more than ten million dollars in damages for lost profits. RVSI moves, in two separate motions, for partial summary judgment dismissing Cybo's counterclaims for fraud and lost profits and its demand for damages on the breach of contract claims in excess of the purchase price set forth in the contract.

### FACTS

The Agreement provides that RVSI sell Cybo certain assets required to construct a turnkey adaptive robotic welding system. Section 1.1 of the Agreement states:

> [T]he Seller shall sell, assign, transfer and deliver to the Buyer all of the Seller's purchase orders, contracts, machinery and equipment, trade secrets, welding technology, software, software development codes, inventory, work-in-process, customer lists and all other non-cash assets (all of the foregoing, including those particular assets, properties and rights specified in Exhibit A hereto, as collectively referred to herein as the "Assets") which related to the Seller's Turn-key Adaptive MIG Welding and Cutting Systems business (the "Business").

A turn-key system is installed in the customer's factory and delivered with a "key" so that the customer can run the system itself. In this case, the key was a software program known as Weld Planner I. Upon receipt, Cybo intended to sell the system to Caterpillar, Inc. and to install it in a Caterpillar plant.

Cybo asserts that RVSI misrepresented which assets were to be sold pursuant to Section 1.1 of the Agreement. In particular, Cybo claims that Section 1.1 provides for the sale of RVSI's alignment and calibration equipment. RVSI contends that the parties reached an understanding prior to the execution of the Agreement that the alignment and

calibration equipment would not be provided. RVSI further relies on Exhibit A to the Agreement, entitled "Description of Assets," which refers to Schedule A–1 for the prices on the stick and boom welding systems, to Schedule A–2 for a description of "Finished Goods Inventory", and to Schedule A–3 for a description of "Capital Assets." Neither Schedule A–2 nor Schedule A–3 mentions alignment or calibration equipment.

RVSI's robotic welding system—including the Weld Planner I software—had previously been installed at Caterpillar and General Dynamic plants, although the parties disagree as to whether those systems were functioning properly when RVSI and Cybo executed the Agreement. The system that RVSI agreed to sell to Cybo required the development of an enhanced version of Weld Planner I.

Cybo asserts that RVSI misled it into believing that the basic Weld Planner I software was a "standard" and "stable" product and that the only risk involved in purchasing the system would be in implementing the enhancements. "Standard" and "stable" are industry terms meaning that the product is production proven (*i.e.*, working well in the field) and that it is "in a box" (*i.e.*, can be taken off the shelf). RVSI contends that it made no such misrepresentations and that, even if it did, Cybo did not justifiably rely on them, both because it knew of RVSI's previous problems with Weld Planner I and because it had tested the software itself. Cybo asserts that it relied on software demonstrations provided by RVSI.

In light of the risks involved in purchasing the enhancements, Cybo agreed to pay for the software in stages, sending RVSI a portion of the total contract price each time it successfully developed an additional feature. RVSI asserts that these "performance milestones" were jointly agreed to by the parties. Cybo contends, however, that it relied on RVSI's misrepresentations as to the adequacy of the proposed milestones in gauging the success of the project and that, at each juncture, it also relied on RVSI's misrepresentations as to whether the milestones had been met.

Cybo further contends that it relied on RVSI's misrepresentations regarding its gross margins on orders, its profits from after-sale service and provision of parts and the amount of technical support to be provided by RVSI in installing the system. With respect to each of these assertions, RVSI claims either that it made no such misrepresentations or that, even if it did, Cybo was not entitled to rely on them because it had researched the relevant issues itself.

In November 1990, the parties executed an Engineering Purchase Order pursuant to which Cybo agreed to pay RVSI $54,000 in exchange for additional engineering services required to install the system. Cybo asserts that it agreed to the Engineering Purchase Order solely because it could not complete the work required on its own, but that the engineering should have been provided pursuant to the Agreement. RVSI asserts that the Engineering Purchase Order was within the terms of the Agreement and that, regardless, it informed Cybo of the necessity of additional engineering prior to the November 15, 1991 deadline for the satisfaction of postclosing conditions on the contract.

Initially, Cybo hired two "robot technicians", Al Bove and Al Treu, to install the system. Neither technician proved sufficiently skilled to solve the problems which arose, and in September 1991, Cybo hired Robert Rongo, an engineer who had previously worked at RVSI, to debug the software. Cybo asserts that RVSI made misrepresentations regarding the level of skill required to install the system and the amount of assistance required from Rongo. RVSI contends that Cybo understood prior to executing the Agreement that it would have to hire Rongo on a full-time basis. Despite Rongo's efforts, the system never worked properly and in the spring of 1992, Caterpillar issued a stop work order. Caterpillar canceled the two purchase orders with Cybo and negotiated a settlement.

Cybo asserts that it lost ten million dollars in future profits as a result of RVSI's wrongful conduct. According to Cybo, RVSI represented at a meeting on August 29, 1990, that Cybo could expect to obtain more than thirty sales and to receive specific profit

margins on each sale. RVSI contends that the contracts specified by Cybo were not contemplated by the parties when they executed the Agreement and that Cybo is unable to prove that it lost the opportunities as a result of RVSI's alleged breach of contract.

The final issue in dispute is the amount of damages permitted on a breach of contract claim. RVSI argues that the amount of damages should be limited to the purchase price listed in the Agreement. Cybo contends that a contractual limitations clause will not limit its damages for fraud.

## DISCUSSION

Motions for summary judgment are granted if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *See Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir.1995). The moving party must demonstrate the absence of any material factual issue genuinely in dispute. *See id.* The court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, the non-moving party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). The party must produce specific facts sufficient to establish that there is a genuine factual issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

A federal court sitting in diversity must follow the choice-of-law rules of the state in which the suit is brought. *See Belmac Hygiene, Inc. v. Belmac Corp.,* 121 F.3d 835, 838 (2d Cir.1997). Since this case was brought in New York, New York's choice-of-law rules apply. New York uses the "paramount interest" approach pursuant to which the law of the jurisdiction having the greatest interest in the litigation will be applied. *See id.* "[G]reat deference is to be given to a contract's designation of the law that is to govern disputes arising from the contract."

*Zerman v. Ball,* 735 F.2d 15, 19–20 (2d Cir. 1984).

Section 10.5 of the Agreement provides for the application of Ohio law to all contract claims. Ohio is the situs of impact of the alleged fraud, *see David Tunick, Inc., v. Kornfeld,* 813 F.Supp. 988, 995 (S.D.N.Y. 1993), and Cybo is an Ohio corporation. There being no objection to the application of Ohio law and every reason to apply it, Ohio law shall govern this action.

### Cybo's Fraud Claims

Cybo's counterclaims contain three sets of fraud claims. Cybo asserts that RVSI (1) fraudulently induced it into entering the Agreement, (2) made fraudulent misrepresentations during performance, and (3) made additional misrepresentations that prevented Cybo from discovering that RVSI had not performed its obligations pursuant to the Agreement. Specifically, Cybo claims that RVSI misrepresented (1) the assets to be sold, (2) the reliability of the software, (3) the adequacy of the proposed performance milestones and whether the milestones had been met, (4) the need for additional engineering, (5) the need for additional engineers, (6) RVSI's gross margins and its profits from after-sale service and provision of parts, and (7) the amount of technical support it would provide. RVSI submits that one or more of the elements necessary to establish a claim of fraud is missing with respect to each of these alleged misrepresentations.

■ In Ohio, the elements of an action in fraud are:

(a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon representation or concealment, and (f) a resulting injury proximately caused by the reliance. *Gaines v. Preterm–Cleveland, Inc.,* 33 Ohio St.3d 54, 514 N.E.2d 709, 712 (1987); *Thompson v. Central Ohio Cellu-*

*lar, Inc.*, 93 Ohio App.3d 530, 639 N.E.2d 462, 471 (1994).

### 1. *The Assets to be Sold*

■ Cybo argues that it was fraudulently induced into executing the Agreement based in part on RVSI's representation that it would provide Cybo with all of the assets—including the alignment and calibration equipment—used to run the robotic welding business. Specifically, Cybo argues that it justifiably relied on the language in Section 1.1 of the Agreement providing for the sale of all "non-cash assets" and claims that the assets being sold were not limited to those set forth in the Schedule of Assets attached to Exhibit A.

RVSI points out that both Harry McHugh, President of Cybo, and Keith Wanner, Senior Vice President of Operations acknowledged during their depositions that they were aware that RVSI intended to keep the equipment used to calibrate and align robo-sensors. And, in Ohio, knowledge of the officers of a corporation is deemed to be knowledge of the corporation. *See Arcanum National Bank v. Hessler*, 69 Ohio St.2d 549, 433 N.E.2d 204 (1982).

■ Even though McHugh signed the Agreement on behalf of Cybo and has not disclaimed knowledge of its contents, Cybo argues that the awareness of Wanner and McHugh is irrelevant because they had no knowledge of the final terms of the Agreement, which were negotiated by Ron Reeve, Cybo's CEO. Reeve states that he understood that all of the assets of the business would be sold to Cybo: "Subsequent to any conversations between Keith Wanner and/or Harry McHugh and RVSI, I had conversations with RVSI and *including* specifically that all assets of the Business were to be sold to us including equipment for the alignment, calibration and testing of the Robo sensors." RVSI contends that Reeve's affidavit is inconsistent with his deposition testimony and previous memoranda and thus should be disregarded by the court. *See Mack v. United States*, 814 F.2d 120, 124 (2d Cir.1987) ("a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment."). In a memorandum dated September 21, 1990, in preparation for a trip to RVSI, Reeve wrote: "I also want to understand and list all of the items which are not being provided which are required to support this business and continue to sell product". During his deposition, Reeve testified that his understanding was that all of the items being purchased by Cybo would be listed on the schedule of assets attached to the purchase order. Reeve further testified, however, that he believed that all of the items required to support the business were being sold. And, later in the deposition, he stated that he believed that the analog and digital boards were being sold but were to be retained in escrow, and that the calibration equipment, the robots and the positioners were also being "sold" to Cybo but were going to be "retained" by RVSI.

RVSI's theory in support of its motion for summary judgment is that Cybo knew from the Agreement itself that certain assets were not being sold. For that reason, granting summary judgment on this claim would, in effect, resolve the breach of contract counterclaim, as to which RVSI has not sought summary judgment and which has not been briefed. Although Cybo's likelihood of success at trial on its claim of fraud regarding the assets to be sold appears exceedingly tenuous, under these circumstances, the benefit of any doubt as to whether a factual issue has been raised will be given to Cybo, and summary judgment will be denied.

### 2. *The Reliability of the Software*

■ Cybo argues that RVSI misrepresented the reliability of the Weld Planner I software prior to the execution of the Agreement and continued to make misrepresentations during performance, by claiming that the software was a standard and stable product, fully tested, and running successfully at Caterpillar and General Dynamics. Cybo bases this contention in part on the deposition testimony of Thomas Smith, Director of Administration at Cybo. Smith stated that, at the August 29, 1990 meeting, RVSI specifically represented that "Weld Planner I software was standard, stable, fully tested, and working well at existing customers" and

"that the risk that it would be accepting would only be the risk of implementation of enhancements." Cybo further relies on the deposition testimony of Ronald Reeve, who stated that RVSI represented to him that its software was a standard and stable product, which was working well at Caterpillar.

RVSI contends that Cybo was not entitled to rely on any alleged misrepresentations because it visited the Caterpillar plant, it was aware that General Dynamics had experienced software-related problems, and it tested the software itself. RVSI refers again to the deposition testimony of Thomas Smith, who admitted that Cybo performed certain tests on the software.

Cybo acknowledges that it visited Caterpillar, but argues that, since Caterpillar appeared satisfied with Weld Planner I, it justifiably relied on RVSI's misrepresentation as to the stability of the product. Cybo also concedes that it knew General Dynamics had had a dispute with RVSI, but asserts that it was unaware that the dispute had been performance related. Cybo bases its argument on Reeve's affidavit, in which he states that he was told that the problems with General Dynamics were not performance related. (In contrast, Wanner acknowledges in his affidavit that, on October 2, 1990, he was told by Al Bove that RVSI and General Dynamics were engaged in a dispute regarding software-related problems. He also states that, in light of Caterpillar's satisfaction with the software, and because the software sold to General Dynamics differed from that sold to Cybo, he decided not to contact General Dynamics.) Finally, Cybo acknowledges that RVSI demonstrated its product to Cybo, but alleges that RVSI neglected to adequately test the system prior to advertising the software as a "standard" and "stable" product. In support of this contention, Cybo refers to the report of Dr. George Cook, who concludes that the tests conducted prior to August 1991 were inadequate for verifying the claimed capabilities of Weld Planner I.

■ Whether or not RVSI made misrepresentations regarding the reliability of its product, Cybo has failed to raise a factual issue as to reliance. "The question of justifiable reliance is one of fact and requires an inquiry into the relationship between the parties.... Reliance is justified if the representation does not appear unreasonable on its face and if, under the circumstances, there is no apparent reason to doubt the veracity of the representation." *Crown Property Development, Inc. v. Omega Oil Co.*, 113 Ohio App.3d 647, 681 N.E.2d 1343, 1349 (1996). Even assuming Cybo was unaware that the General Dynamics dispute was performance related, Wanner's acknowledgment that a dispute existed, coupled with Smith's acknowledgment that Cybo performed tests on the software and Cybo's visit to the Caterpillar plant, belies Cybo's claim that it was entitled to rely on misrepresentations made by RVSI. *See Togo International, Inc. v. Mound Steel Corporation*, 106 Ohio App.3d 282, 665 N.E.2d 1160, 1164 (1995) (no reliance where plaintiff sought, albeit unsuccessfully, to obtain an independent inspection); *DeCapua v. Lambacher*, 105 Ohio App.3d 203, 663 N.E.2d 972, 974 (1995) (no reliance where plaintiff hired own surveyor). Accordingly, Cybo's claim fails as a matter of law.

### 3. Milestones

■ Cybo contends that it relied on RVSI's misrepresentations as to the adequacy of the proposed milestones in gauging the success of the project. RVSI argues that Cybo did not rely on any alleged misrepresentations, but that the final milestones were the product of arms length negotiations between the parties. In fact, Smith testified during his deposition that he reviewed multiple drafts of the proposed milestones with Wanner and McHugh, and Wanner testified that he believed the milestones were sufficient when they were established. In light of these acknowledgments, Cybo has failed to raise a factual issue as to justifiable reliance. *See Togo International, Inc.*, 665 N.E.2d at 1164; *DeCapua*, 663 N.E.2d at 974.

Cybo also argues that RVSI misled it, at each juncture of the project, into believing that the milestones had been met. RVSI contends that Cybo did not rely on the misrepresentations, if *there were any, because Cybo checked and signed off on the milestones itself.* Although Cybo acknowledges doing "some checking itself", Cybo argues

that the fact that it did its own checking does not mean that it did not also rely on RVSI. Regardless of whether Cybo actually relied on any misrepresentations made by RVSI, since it did "some checking itself," there is no evidence that such reliance was justifiable. *See Togo International, Inc.*, 665 N.E.2d at 1164; *DeCapua*, 663 N.E.2d at 972. Thus, Cybo's milestone claims fail as a matter of law.

### 4. *Need for Additional Engineering*

■ Cybo argues that RVSI misled it, prior to the execution of the Agreement, into believing that no additional engineering would be required to install Weld Planner I by stating that the software was a standard and stable product. Cybo bases this contention on the affidavits of Reeve and Smith who both understood that no further engineering would be necessary. Cybo further contends that the engineering provided pursuant to the Engineering Purchase Order actually should have been provided pursuant to the Agreement. RVSI asserts, however, that, since it informed Cybo of the necessity of additional engineering prior to the November 15, 1991 deadline for satisfaction of post-closing conditions, if Cybo believed the Engineering Purchase Order was not within the terms of the Agreement, it could have walked away from the deal. RVSI also points out that McHugh acknowledged that Wanner and Smith had convinced him that the Engineering Purchase Order was consistent with the Agreement.

Whether or not Cybo has raised a factual issue as to the veracity of RVSI's representations, given Cybo's decision not to walk away from the deal, there is no evidence of justifiable reliance. *See Thompson*, 639 N.E.2d at 471–72 (no evidence of justifiable reliance where plaintiff acknowledged that he knew the statements upon which he allegedly relied were false). Accordingly, Cybo's claim fails as a matter of law.

### 5. *Need to Hire Experts*

■ Cybo argues that RVSI fraudulently induced it into signing the Agreement in part by representing that the assistance of two "robot technicians" would be sufficient to in-

stall the system. Cybo further contends that, because the robot technicians were not sufficiently skilled, they were incapable of determining whether the software was effective and/or whether the milestones had been met. RVSI argues that Cybo was not entitled to rely on RVSI's misrepresentations, if there were any, because it interviewed the robot technicians itself before executing the Agreement. RVSI has mischaracterized the nature of the alleged misrepresentation. Cybo does not argue that RVSI misrepresented the qualifications of the robot technicians but rather that RVSI misled Cybo into believing that their skills would suffice to complete the project. Cybo bases its contention on Reeve's affidavit, in which he states that he was assured by RVSI that the robot technicians were sufficiently skilled.

Cybo also contends that it relied on RVSI's representation that it would not be necessary to hire Rongo on a full time basis. RVSI asserts that Cybo knew from the beginning that Rongo's assistance would be required. RVSI again mischaracterizes the nature of the alleged misrepresentation. Cybo acknowledges that it understood that it would be necessary to hire Rongo on a part-time basis, but argues that RVSI misrepresented the extent of Rongo's assistance required. Cybo bases this contention on Reeve's affidavit in which he states that he believed Rongo's assistance would not be necessary.

Based on Reeve's affidavit, Cybo has raised factual issues both as to whether RVSI made misrepresentations regarding the necessity for additional engineers and as to Cybo's reliance on any such misrepresentations.

### 6. *The Gross Margins on Order and Profit from After–Sale Service and Spare Parts*

■ Cybo argues that RVSI fraudulently induced it into entering the Agreement by misrepresenting its gross margins on the Caterpillar and software-purchase orders and its profits from after-sale service and provision of spare parts. Cybo refers to the affidavits of Reeve and Smith who both state that they relied on RSVI's estimations of sales.

RVSI has provided a memorandum, prepared for internal purposes prior to the execution of the Agreement, which includes the same numbers quoted to Cybo. Cybo argues that RVSI cannot point to any evidence establishing the veracity of the information contained in the memorandum. Cybo points out that Robert Rongo, who worked for RVSI for 17 years prior to beginning work for Cybo in 1991, has stated that the information contained in the memorandum is incorrect. In his affidavit, Rongo states that he has "personal knowledge that many of the items included in the $360,000 represented to Cybo to be after-sales service were not for after-sales service or spare parts after sale, but were for correction of initial problems with the systems which were needed to get the systems up and running in the first place, particularly at General Dynamics."

Assuming Rongo's affidavit raises an issue of fact as to the accuracy of the memorandum, Cybo has failed to raise a factual issue as to whether RVSI knowingly provided Cybo with false information. Given that the memorandum was initially prepared by RVSI for itself, the mere existence of the memorandum is insufficient to prove knowledge.

Moreover, even if RVSI did make knowing misrepresentations, Cybo did not justifiably rely on them. Smith states in his affidavit that he relied on RVSI's estimates regarding profits from after-sale service and provision of parts to prepare his own cash flow projections. However, McHugh testified during his deposition that he prepared his own projections prior to the execution of the Agreement without taking into account the numbers quoted by RVSI. McHugh's deposition testimony was as follows:

Q: Now, during those discussions, did RVSI have any conversations with you regarding what they thought their margins would be on the stick and boom system?

A: I think they did. I can't recall what the numbers were. I sort of wrote it off to the games people play.

Q: In connection with preparing your own cash flow and income and expense projections for Cybo prior to signing the deal, to what extent, if any, did you rely on RVSI's estimates of margin and to what extent did you just input your own data, based on your own beliefs?

***

A: It was entirely our own work.

Q: So you didn't rely on the RVSI estimates?

A: No.

***

Q: Now, is it fair to say that in preparing those projections and analyses for income, you counted only what Caterpillar was going to pay on the stick and boom system?

A: Yes.

Q: Did you project income from any future sales to other customers?

A: No.

Q: Did you project any income from sales of spare parts or after-sale service to any other customers?

A: No.

In sum, notwithstanding Smith's affidavit, given the deposition testimony of McHugh, the president of Cybo and the person who signed the Agreement on behalf of Cybo, Cybo fails to raise a factual issue of justifiable reliance. *See Togo International, Inc.,* 665 N.E.2d. at 1164; *DeCapua,* 663 N.E.2d. at 974; *Wissel v. Ohio High School Athletic Ass'n,* 78 Ohio App.3d 529, 605 N.E.2d 458, 465–66 (1992) (dismissing fraud claim on ground that plaintiff failed to provide evidence of reliance on misrepresentations of athletic association). Accordingly, these claims fail as a matter of law.

### 7. Technical Support

██ Cybo contends that RVSI misled it into believing that it would retain qualified personnel capable of providing the technical support required to install the system. Cybo further contends that, because RVSI reneged on its promise to retain qualified personnel, Cybo was obliged to hire Rongo as a full-time employee. RVSI argues, however, that Cybo has not pointed to a single instance in which RVSI was unable to provide the support

requested. In response, Cybo asserts that "[t]he proof of whether RVSI did actually retain sufficient expertise to provide Cybo the assistance and support required is in the *results* as RVSI and Cybo, working together, could not get the systems working right for the Caterpillar order." Cybo is not entitled to rely on the eventual failure of the project to support a claim of fraud during performance. That both parties discovered midway through installation that the project required additional expertise does not prove that RVSI was aware, prior to the execution of the Agreement, of the performance-related software problems. Accordingly, Cybo's claim fails as a matter of law.

### Cybo's Claims for Lost Profits

■ Lost profits may be recovered in Ohio if (1) the "profits were within the contemplation of the parties at the time the contract was made," (2) the "loss of profits is the probable result of the breach of contract," and (3) the "profits are not remote and speculative and may be shown with reasonable certainty." *Charles R. Combs Trucking, Inc., v. International Harvester Co.*, 12 Ohio St.3d 241, 466 N.E.2d 883 (Ohio 1984). "[T]he amount of the lost profits, as well as their existence, must be demonstrated with reasonable certainty." *City of Gahanna v. Eastgate Properties, Inc.*, 36 Ohio St.3d 65, 521 N.E.2d 814, 818 (1988).

Cybo claims it is entitled to recover more than ten million dollars in damages for lost profits from contracts it would have been awarded had the Weld Planner I software worked. In support of its claim, Cybo argues that, since RVSI made specific representations to Reeve during the August 29, 1990 meeting about each of the items identified, each of those items was within the contemplation of the parties when they executed the Agreement. Cybo bases this contention on Reeve's affidavit and his notes from the meeting, in which he refers to specific contracts, gross amounts and net profits. In his affidavit, Reeve states: "RVSI employees ... further represented that if Cybo purchased the Business, it would have a product with a competitive advantage in the marketplace which would enable Cybo to obtain specific contracts with specified customers with specified profit levels. For example, Bob King of RVSI told me that the purchase of the state-of-the-art, unique technology would result in a contract with GM Diesel for $475,000 at 49% mark-up for a profit of $232,750, as reflected in my notes." RVSI moves to dismiss all of Cybo's claims for lost profits except those for lost business arising from RVSI's alleged failure to deliver the calibration equipment, for a "money asset" Cybo claims should have been delivered pursuant to the Agreement, and for future profits associated with the Caterpillar job itself.

■ The challenged claims for lost profits fail under *Combs* for two reasons. First, Reeve's notes and affidavit do not raise a factual issue as to whether the prospective business opportunities were within the contemplation of the parties at the time the contract was made. To begin with, that the purchase price in the Agreement was only $537,000, and that the Agreement allocated the entire purchase price to the robotic welding system rather than to goodwill or third party sales, strongly indicates that neither party contemplated ten million dollars in future profits as part of the deal. The mere fact that RVSI described potential contracts does not establish that lost profits on such contracts were part of what Cybo paid for in buying the equipment. A different conclusion could well implicate Section 351(3) of the Restatement Second of Contracts, which provides: "A court may limit damages for foreseeable loss by excluding recovery for loss of profits ... if it concludes that in the circumstances justice so requires in order to avoid disproportionate compensation."

■ Cybo has also failed to raise a factual issue as to whether the loss of profits was the probable result of RVSI's breach of contract. The plaintiff in *Combs* provided evidence that he had entered into a contract with a third party, which he was required to breach as a result of the defendant's wrongful conduct. *See Combs*, 12 Ohio St.3d at 242, 466 N.E.2d 883. *See also S & K Sales Co. v. Nike, Inc.*, 816 F.2d 843 (2d Cir.1987) (proof that sales dropped after manufacturer terminated agreement with sales company sufficient to prove that lost profits were the

result of manufacturer's wrongful conduct). Cybo's evidence does not meet the same standard of specificity. Cybo acknowledges that two of the proposed contracts were never awarded to anyone; that it does not know who, if anyone, received twelve of the others; and that it never submitted proposals for six others. Moreover, Cybo provides no evidence from any third-party witnesses stating that they would have awarded Cybo a contract had Weld Planner I worked. Cybo argues that it would be unreasonable to require it to prove that RVSI's wrongful conduct was the sole reason it was not awarded the contracts because there are too many factors involved in purchasing a robotics welding system for any third party to say with certainty that it would have chosen Cybo's system over a competitor's. But Cybo has not just failed to show that RVSI's conduct was the sole reason for its loss. It has failed to show any evidence that, had the system worked, Cybo would probably have gotten the contracts. Absent evidence linking the loss of profits to RVSI's breach of contract, Cybo's claims for lost profits fail as a matter of law. *Cf. Ostano Commerzanstalt v. Telewide Systems, Inc.*, 794 F.2d 763, 767 (2d Cir.1986) (under similar New York law, plaintiff did not prove that loss of business resulted from defendant's inability to deliver films).

### Damages on Breach of Contract Claim

 Insofar as Cybo's claim for breach of contract is concerned, Section 9.4 of the Agreement expressly limits RVSI's liability on a breach of contract claim to the purchase price to be paid by Cybo under the Agreement, and Ohio law expressly recognizes provisions that limit or apportion damages in the event of a breach. *See Lake Ridge Academy v. Carney*, 66 Ohio St.3d 376, 613 N.E.2d 183 (1993). Moreover, since Cybo does not claim to have made any royalty payments to RVSI, RVSI is not responsible for compensating Cybo pursuant to the royalty provision of the Agreement. Of course, as RVSI recognizes, the contractual limitation does not limit Cybo's damages on its fraud claims.

### Conclusion

RVSI's motion for summary judgment is denied as to Cybo's claims that RVSI fraudulently induced it to enter the Agreement by misrepresenting the assets to be sold and by misleading it into believing that the assistance of two robot technicians would suffice. RVSI's motion is granted as to all other claims challenged, which are hereby dismissed.

Cybo is not entitled to damages for lost profits, and Cybo's damages on the breach of contract claim are limited to the purchase price set forth in the Agreement.